Billings, A.J.
The defendant, charged with trafficking in cocaine (over 100 grams), possession of marijuana with intent to distribute, and school zone violations, moves to suppress (1) statements and (2) physical evidence, both obtained from him in the course of a warrantless arrest as the police were attempting to execute a search warrant on what the Commonwealth alleges was his residence. For the reasons that follow, the motion is DENIED.
FINDINGS OF FACT
At the evidentiary hearing on both motions, I heard testimony from Sgt. James Trudell and Detective Linda Coughlin of the Lowell Police Department, and from the defendant. On the basis of the credible evidence, I find the following facts.
Based on information connecting the defendant with cocaine trafficking in a certain Lowell bar, the police obtained a warrant to search the premises at 50 Hawthorn Street, Lowell. The warrant specified a daytime search, knock-and-announce, and did not authorize a search of persons present.
A team arrived on Hawthorn Street about 4:45 p.m. on April 28,2002. In the course of a pre-raid surveillance from the street, the officers noticed two persons leave the premises in a green Volvo. Several officers, including Trudell, Coughlin and Detective Sammaris, followed the Volvo. Trudell was the first to return to Hawthorn Street, which he did in 30 to 60 seconds, and resumed waiting.
From inside his unmarked black Mustang Trudell noticed a man, whom he identified in court as the defendant. There was then an encounter, the precise location and other details of which differ as between the versions related by Trudell and Coughlin, on the one hand, and the defendant, on the other.
A. The Police Version
In the police version the defendant, standing on the porch of 50 Hawthorn, made a gesture to attract Trudell’s attention. He asked, “Why are you following my friends?” Suspecting he had been “made,” Trudell exited his car and walked up the path and porch steps. He displayed his badge, identified himself as a police officer, and asked the defendant if he might speak with him. The defendant, appearing nervous, asked “What are you doing here?” and started to force his way past Trudell to the front door of the house. The defendant put his hands on Trudell and pushed him. Trudell said, “I’m a police officer; get your hands off me,” and physically blocked the defendant from entering the house.
At about this time Coughlin and Sammaris arrived, having broken off their pursuit of the Volvo. Coughlin had the search warrant with her. Sammaris bounded up the steps and assisted Trudell in subduing the defendant. He was cuffed and pat-frisked. A pair of large bulges in the defendant’s right front pocket turned out to be a cigar tube containing what appeared, and was later tested, to be marijuana, and a roll of about $11,000 in U.S. currency. Coughlin told the defendant she had a search warrant for the premises, news which the defendant appeared not to welcome.
The defendant was brought inside and seated on a couch in a downstairs room. He was read his Miranda rights, and said he understood them. He was coherent and responsive. His English was good. Coughlin showed him the search warrant, which he read, and Trudell explained what they were there to look for. Other officers asked the defendant questions, to which the defendant answered that he lived in the house and rented it from one Joe Ignatowicz.
The house was being renovated, and was largely gutted. Hie bathroom had a working toilet. Of the two bedrooms upstairs, only one had plaster, a bed, and was habitable. In this were found clothes belonging to the defendant, 95 grams of cocaine in a jacket pocket, and several thousand plastic bags. Downstairs in the kitchen, the police found 15 more grams of cocaine on the kitchen table, and also marijuana in plastic bags, cutting agent, a scale, and scissors. A lease agreement found in the house identified the defendant as the tenant.
B. The Defendant’s Version
The defendant testified that he was on the sidewalk outside 50 Hawthorn Street when he noticed Trudell’s black Mustang coming slowly up the street toward him. He stepped into the street and asked, “What are you doing?” Trudell opened the door while the car was still moving, but eventually put it into Park and stepped out. At this point, the defendant stepped back onto the sidewalk and began walking up the front walk to the house. Trudell said he wanted to talk to the defendant, and began running behind him. He caught up while the defendant was still on the walkway and grabbed him. Trudell was shortly joined by another officer. They restrained him and began going through his pockets. They mounted the porch, at which point the defendant put his hand on Trudell’s chest and asked, “Who are you? What are you doing?” Only after *602 he had finished going through the defendant’s pockets did Trudell pull out his badge and identify himself as a police officer.
More officers arrived, and the defendant was brought inside. No one read him his Miranda rights; everyone asked him questions at once; and Trudell “displayed” the search warrant by moving it up and down in front of his face so that he could not read it.
In response to questions by the police, the defendant told them that he was in the process of renting the house from Ignatowicz, and that there were several people staying there presently. He testified at the hearing that the lease was just a draft without business terms, signed a day and a half before so that he could get the utilities switched over to his name; that he was not staying in the house (though he did keep some personal effects there); that he was living at 18 Melbourne Terrace, Medford; that he was not the one doing the renovations; and that while he had been inside the house that day before the police arrived, he had not noticed the cocaine on the kitchen table.
For numerous reasons, I find Trudell’s and Coughlin’s recounting of events of April 28,2002 more credible, in the material particulars, than the defendant’s. The defendant’s version credits the police with numerous elementary blunders in basic pro-cedureconfronting and arresting a suspect without identifying oneself as a police officer; questioning the arrestee without giving him his Miranda rights; and playing “hide the ball” with the warrant being executed come to mind. Both officers were experienced, with 16 and 10 years on the force, respectively; there is no reason to think that either failed to grasp these basics; and there was no rational reason in this case to dispense with them, particularly in the presence of several other officers. Other aspects of the defendant’s testimonyparticularly, that he was storing personal items in a house he had not yet moved into and therefore did not control, the implication that whatever contraband was present belonged to unnamed persons who were staying in the house in the meantime, and that he was unaware of illegal drugs in plain view on the kitchen tableare facially implausible, and cast additional doubt on his testimony. I find that the events of April 28, 2002 unfolded substantially in the manner related by Trudell and Coughlin.
CONCLUSIONS OF LAW
A. Police Authority to Prevent Interference with Execution of Search Warrant
The admissibility of both the defendant’s statements and the physical evidence taken from his person depends, in large part at least, on the legality of the detention that preceded, and continued throughout, the search and the statements. The legality of the detention depends, again in large part, on the parties’ respective rights in the moment that the defendant was moving toward, and Trudell moving to block, the front door to 50 Hawthorn Street.
Police officers executing a valid search warrant are given a certain amount of room to exercise sound judgment to protect their persons, the evidence, and the integrity of the search. As the SJC said in Commonwealth v. Garner, 423 Mass. 735 (1996):
Nothing in the language of the Constitution or in this Court’s decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrantsubject of course to the general Fourth Amendment protection “against unreasonable searches and seizures.”
423 Mass. at 740, quoting Dalia v. United States, 441 U.S. 238, 257 (1979).
Discretion of officers executing both search and arrest warrants has been exercised, and upheld, in a variety of situations in which there were specific, articulable, and factually supported reasons for the actions taken.
Police may prevent members of the public from leaving (Michigan v. Summers, 452 U.S. 692 (1981)) or from entering (2 W. LaFave, Search and Seizure, §4(a)(d) at 636 n.52 (1996)) premises being searched, where necessary to protect the officers’ safety, the integrity and orderly completion of the search, or both.
They may conduct a protective sweep to ensure their safety while executing an arrest warrant (Maryland v. Buie, 494 U.S. 325, 337 (1990)) or a search warrant (States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990); Commonwealth v. Purvis, 15 Mass. L. Rptr. 433, 2002 WL 31770445 (Mass. Super.; Agnes, J.)), or while making a valid warrantless arrest (Commonwealth v. Bowden, 379 Mass.472, 478 (1979)).
Officers may even make an unannounced entry, not authorized by the warrant, in unusual situations where “facts arising at the threshold give them probable cause to believe that an unannounced entry is necessary in order to prevent destruction of the evidence.” Commonwealth v. Scalise, 387 Mass. 413, 422 n.8 (1982).
The executing officers’ discretion is not, of course, unbridled. The warrant, which “both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches” (Commonwealth v. Pope, 354 Mass. 625, 629 (1968)), must be executed according to its terms. “Searches and seizures conducted outside of the scope of a valid warrant are presumed to be unreasonable.” Commonwealth v. Balicki, 436 Mass. 1, 8 (2002). An arrest warrant does not authorize a search, beyond whatever protective sweep and/or search incident to arrest is *603 necessary to protect the safety of the arresting officers and inventory the belongings of a person being placed in custody. See Commonwealth v. Rostad, 410 Mass. 618 (1991); Commonwealth v. Bowden, 379 Mass. 472, 477-78 (1980). Nor does a search warrant for a particular location and object authorize a purposeful search of other places or for other objects, Balicki, or of persons present at the location but posing no particular threat to the officers or to the search. Ybarra v. Illinois, 444 U.S. 85, 92-94 (1979).
Fundamentally, however, a search warrant does authorize the officers executing it to search the place (s), for the thing(s), at the time and in the manner, specified therein. Implicit in this authorization is that once having arrived at the premises with the warrant[1] identified themselves as police officers, and stated their purpose, Commonwealth v. Gondola, 28 Mass.App.Ct. 286, 287 (1990), they may execute the warrant, according to its terms, and without unreasonable interference from members of the public.
Closest among the reported cases, on its facts, to this one is Michigan v. Summers, supra. There,
As Detroit police officers were about to execute a warrant to search a house for narcotics, they encountered respondent descending the front steps. They requested his assistance in gaining entry and detained him while they searched the premises. After finding narcotics in the basement and ascertaining that respondent owned the house, the police arrested him, searched his person, and found in his coat pocket an envelope containing 8.5 grams of heroin.
452 U.S. at 693.
The Supreme Court upheld the detention and the chain of events that followed it. In so doing, it considered and balanced the respective interests of the occupant and of law enforcement:
Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent’s house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizensunless they intend flight to avoid arrestwould elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondent’s own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station... [T]he detention of this respondent was “substantially less intrusive” than an arrest.
In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the “articulable facts” supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.
452 U.S. at 701-03 (citations and footnotes omitted).
The warrant in this case authorized the police to search 50 Hawthorn Street, during the daytime, after a knock-and-announce, for cocaine and for monies, proceeds, paraphernalia and records of drug trafficking. The search only went off-track when Trudell saw the defendant headed from his position on the porch toward the front door. Trudell commanded him to stop, but he kept going. Trudell physically blocked his way to the door, and the defendant initiated a shoving match.
The defendant had clearly signaled his strong desire to get inside the house before the police did. A reasonable officer in Trudell’s position would have been justified in concluding that he might be going for a weapon, or to destroy or conceal the contraband for which the warrant authorized a search, or both. The legitimate interests of the police in protecting their own safety, and in facilitating “the orderly completion of the search” (which would include minimizing the likelihood that a race to the evidence might end in its destruction, and/or injury to one or both of the contestants), justified Trudell in blocking the defendant from entering the house. When the defendant resisted and assaulted him, Trudell was further justified in detaining and securing him until Coughlin arrived *604 with the warrant, and throughout the time it took to execute it.
B. Search Incident to Arrest
The detention of the defendant was also a lawful arrest. Trudell had probable cause to believe the defendant had committed an assault and battery on a police officer (himself), a felony. See G.L.c. 265, §13D; Commonwealth v. Hason, 387 Mass. 169, 173 (1982).
From this proceeded the authority to arrest the defendant; to conduct (at least) a pat frisk for possible weapons or contraband, and to retrieve from his pockets any objects that might be such. Commonwealth v. Alvarado, 420 Mass. 542, 551 (1995). The fact that the search warrant did not authorize a search of persons present is immaterial; once Trudell made a lawful, warrantless arrest of the defendant, the limited search incident to that arrest was lawful as well.
C. The Defendant’s Statements
The admissibility of the defendant’s statements depends on whether he was advised of and waived his Miranda rights, and whether he made the statements voluntarily and without coercion.[2] See Commonwealth v. Garcia, 379 Mass. 422, 428 (1980). Although the defendant’s recollection of events, if credited, would warrant a negative answer to the first question and perhaps to the second as well, I do not credit it. I find, beyond a reasonable doubt, that Trudell correctly advised the defendant of his rights to remain silent, to have counsel present, and to have counsel appointed if he was indigent; that the defendant understood these rights and elected to speak to the police (albeit, it appears, on somewhat limited subject matters) thereafter; that the manner of his interrogation was not coercive; and that considering all of the circumstances, he made the statements that he did freely and voluntarily.
ORDER
For the foregoing reasons, the defendant’s Motion to Suppress EvidenceWarrantless Search, and his Motion to Suppress Statement, are both DENIED.

 note thatTrudell’s interaction with the defendant began, quickly escalated, and resulted in his detention, all before Coughlin arrived with the warrant. Article 14 of the Massachusetts Declaration of Rights “implicitly requires law enforcement officials to possess a copy of the warrant when executing it, unless there are exigent circumstances which would permit a warrantless search.” Commonwealth v. Guaba, 417 Mass. 746, 754 (1994). Trudell was not executing the warrant before Coughlin arrived with it, however; his actions, in blocking the defendant’s access to the door, was more in the nature of securing the premises, and were reasonable and permissible in the circumstances. Cf. Commonwealth v. Blake, 413 Mass. 823, 829 & n.7 (1992) (“Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents”).

Unlike the defendant in Commonwealth v. Ferrarra, 31 Mass.App.Ct. 648, 653-55 (1991), the defendant was unquestionably in custody at the time he made the statements.