COMMONWEALTH *vs.* DEREK GARNER.

Suffolk. October 7, 1996. - November 8, 1996.

Present: WILKINS, C.J., ABRAMS, O'CONNOR, & FRIED, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Forcible entry by police.

Police officers, who obtained a valid no-knock search warrant for premises whose occupants were reasonably considered to be heavily armed and vicious, did not execute the warrant in an unreasonable manner by detonating a stun grenade in a rear bedroom immediately prior to the officers' entry into the apartment. [743-745]

This court declined to adopt a rule of practice that would require police to seek prior judicial authorization for the use of stun grenades in the execution of a search warrant. [745-746]

INDICTMENTS found and returned in the Superior Court Department on September 14, 1994.

A pretrial motion to suppress evidence was heard by *Gordon L. Doerfer, J.*

An application for leave to prosecute an interlocutory appeal was allowed by *Abrams, J.,* in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

*Stewart Hall Grimes* for the defendant.

FRIED, J. A Superior Court judge granted the defendant's motion to suppress evidence seized pursuant to the execution of a no-knock warrant on the ground that the use of a "flashbang" diversionary device in the course of the warrant's execution was unreasonable in the circumstances. A single justice of this court allowed the Commonwealth's application for an interlocutory appeal, and we now vacate the order allowing the defendant's motion to suppress.

I

The warrant in this case was issued to the New Bedford

police in the course of their investigation of an armed robbery and rape that had occurred two days earlier. Two masked men — one armed with a handgun, the other with a sawed-off shotgun — had entered an all night convenience store at 3 A.M. One of the men forced a clerk into a back room and raped her. He then took a wedding ring, a class ring, and several other rings from her. The other robber forced a customer, who had entered the store during the robbery, to lie on the floor and took his wallet. The robbers took cash, merchandise, and lottery tickets from the store. Later that day, clerks from several stores in the area alerted the police that a woman was seeking to cash lottery tickets which were flagged as possibly stolen. As a result of their investigation, the police identified this woman as Sharon Hubbard and obtained a warrant to search her home for the stolen lottery tickets. In the course of that search, Hubbard was arrested. Hubbard told the police that, approximately one hour after the robbery, her boy friend Derek Garner and his nephew Markeith Garner had visited her apartment. One was armed with a handgun, the other with a sawed-off shotgun. They had in their possession a large amount of change, paper currency, several hundred lottery tickets, and two rings whose description corresponded to those taken from the clerk who had been raped. Hubbard also told the police that the two men had given her an account of the robbery. Although they did not mention the rape, they did say that they had forced a clerk to strip because she would not give them the key to the videotape machine. Using this information, the police obtained a no-knock warrant to search Derek Garner's apartment at 1261 Church Street in New Bedford.

According to the judge's summary, which he denominated "Background," Lieutenant Eugene Hebert, the police witness at the suppression hearing, testified regarding the department's preparations for the execution of the warrant, their actual deployment at the time of its execution, what was done once the warrant was executed, and the purpose and characteristics of the "flash-bang" device or stun grenade which is at the center of the controversy in this case. Lieutenant Hebert testified that he was in charge of coordinating the execution of the warrant. From the information available to him he had concluded that the inhabitants of 1261 Church Street might be armed with a handgun and a sawed-off shotgun. He had a

sense of the layout of the apartment and was aware that, in addition to Garner and another male, a pregnant woman might be present with her two small children. Before the police entered, Hebert stationed sniper teams outside the apartment. Hebert's plan was to have Officer LaVoie break a window of one of the rear bedrooms, which were believed to belong to the adults, look inside and drop the diversionary device. This device — variously referred to as a flash-bang device, a stun grenade and a diversionary device — is intended to make a loud noise and produce a large quantity of smoke when discharged. It is not designed to cause fire, but rather to surprise and distract.[1] Because the device does cause an explosion and flash Hebert acknowledged that it is inherently dangerous and carries a warning label that "misuse can cause physical injury or death." The judge noted Hebert's testimony that he had assigned an officer to protect the woman and children and remove them from the apartment when the team moved in.

According to the judge's findings, the New Bedford police require special training in the use of this diversionary device and the department had a policy relating to its use that required the deploying officer to break a window and look into the room before detonating the device, just as LaVoie had been instructed to do in this instance.[2] The judge found that LaVoie broke a window in a back bedroom and dropped the device inside without looking inside. A four year old child was in the bedroom when the device went off with a bright flash and "filled the apartment with smoke." Immediately police officers in black military outfits rushed into the apartment. In the ensuing excitement the pregnant woman was struck in the face and abdomen by a door. The police swept through the apartment and secured it within three to four minutes. No one offered any resistance. The woman complained of feeling ill and was taken to a hospital. The child was screaming and gagging from the smoke in the apartment, and was treated a few days later "for a health complaint as-

---

[1]At the hearing, Hebert provided further explanation regarding the diversionary device. According to his testimony, the stun grenade is a metal cylinder containing black powder and a small amount of magnesium which produces a loud noise "like an M-80 firecracker" and a big flash. It is not designed to cause injury or damage and is reusable.

[2]Throughout his decision, the judge refers to Officer LaVoie as "Levine."

sociated with smoke inhalation, and continues to suffer from nervousness, crying and nightmares." As a result of their search the police seized a sawed-off shotgun, ammunition, credit cards, and jewelry that might have been taken in the robbery, and clothing that the robbers might have worn.

The judge ordered that all the evidence seized in the execution of the warrant be suppressed. The judge first ruled that Markeith Garner lacked standing to challenge the constitutionality of the search because he had asserted no interest in the apartment and, in the circumstances of this case, could not be the beneficiary of our rule of automatic standing. See *Commonwealth* v. *Amendola*, 406 Mass. 592 (1990).[3] The judge went on to rule that the warrant was supported by probable cause as

> "the police were warranted in having a reasonable belief that weapons might be present on the premises and that a no-knock warrant was needed for their safety when entering Derek Garner's apartment. . . . In addition, there were no changed circumstances as to the presence of weapons at the premises which would have required the police officers at the scene to dispense with the no-knock authorization and instead announce their presence."

The basis for the judge's suppression of the evidence was thus not the validity of the no-knock warrant but the manner in which it was executed.

The judge acknowledged that the method used in executing a search warrant is generally left to the discretion of the officers executing it, but went on to note that the method of execution is also subject to the general strictures against unreasonable searches and seizures found in the Fourth Amendment to the United States Constitution. See *Dalia* v. *United States*, 441 U.S. 238, 257 (1979). The judge determined that the police had used excessive force in executing the warrant and therefore ruled that the search and seizure were unreasonable

---

[3]His citation to our rule of automatic standing in this context may be inapposite, since the instant case was decided solely under the Fourth Amendment to the United States Constitution, and the Supreme Court has held that the doctrine of automatic standing has been abandoned as a matter of Federal law. *United States* v. *Salvucci*, 448 U.S. 83 (1980).

and the evidence seized must be suppressed. Stating that the prevailing test for reasonableness was an objective test examining the circumstances as they were known to the police officers at the time of the warrant's execution, the judge asked whether the use of the "pyrotechnic diversionary device was *necessary* and thus reasonable conduct, to effect a safe entry into the dwelling" (emphasis supplied). He concluded that the device's use could not meet this criterion, based on his findings (1) that, although the police knew the defendant was in the apartment and was probably armed, (2) they were also aware that two small children and their pregnant mother would be present, and (3) they had made no effort to determine whether the apartment was barricaded or whether its occupants were monitoring the area for police activity, and there was no sign that any activities, such as a hostage situation, existed within the apartment and endangered its inhabitants. "In short, the officers did not possess information that warranted the strength of the police assault on the premises." Thus it would seem that the judge's conclusion was based not just on the use of the diversionary device, but also on the mode of entry, the number of officers, and the way they were dressed.

The judge was similarly influenced by the fact that the device was deployed in a child's bedroom where the child was present. Although the judge heard testimony that "the officer who had deployed the device had been *instructed* to look into the room before throwing in the device, there was no evidence offered to show that the officer had in fact done so" (emphasis in original). This "gap in the evidence" led the judge to declare that either the police had not acted in good faith because the device was not deployed "in accordance with the department's own policy," or the actions were rendered even "more egregious" because the officer looked into the room and deployed the device despite the child's presence.

## II

### A

At the outset we note that the judge explicitly limited his analysis to the Fourth Amendment to the United States Constitution, and we have no claim before us under our Declara-

tion of Rights. The authorities invoked by the judge and by Garner's brief offer but slim support for their conclusions. The two Supreme Court decisions to which the judge refers are only tangentially apposite. In *Dalia* v. *United States, supra,* the Court considered the lawfulness of a covert entry made by Federal agents onto business premises to place an electronic surveillance device. The electronic surveillance was authorized by a warrant issued pursuant to 18 U.S.C. §§ 2510-2520. The Court characterized as "frivolous," *id.* at 247, Dalia's contention that the Fourth Amendment prohibits all covert entries onto private property, and noted that "[i]t is well established that law officers constitutionally may break and enter to execute a search warrant where such entry is the only means by which the warrant effectively may be executed." *Id.*[4] In the course of its opinion in *Dalia,* the Court stated:

> "Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant — subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures' " (footnote omitted).

*Id.* at 257. It is the caveat contained within the last clause to which Garner and the judge refer. The general point made in that caveat is unexceptionable, and the judge might as well have referred to *Tennessee* v. *Garner,* 471 U.S. 1, 8, 11 (1985), in which the Court ruled that the use of deadly force to prevent the escape of a suspected felon constituted an unreasonable seizure and violated the suspect's Fourth Amendment rights where the suspect posed no significant threat to the officers. Nor does *Graham* v. *Connor,* 490 U.S. 386 (1989), on

---

[4]This unnuanced judgment was later qualified by the Supreme Court in *Wilson* v. *Arkansas,* 514 U.S. 927 (1995), which required officers to knock and announce their intentions before executing a warrant, except where previously authorized or in exigent circumstances. This qualification has no bearing here, as the police were acting under the authority of a no-knock warrant which the judge found had been properly issued.

which principal reliance is placed, move us any closer from the realm of generality to the circumstances of this case. In *Graham* a police officer stopped Graham, a diabetic, because he believed Graham was behaving suspiciously. What appeared to the officer to be suspicious behavior was, in fact, Graham's response to what he sensed as an impending insulin reaction. Not only did the officer disbelieve the explanation proffered by Graham and his friend, but the officers called for backup assistance, treated him with great roughness which caused injuries, and they refused him the sugared food or drink he needed. The Court acknowledged the possibility of liability under 42 U.S.C. § 1983 for this mistreatment, and — citing *Tennessee* v. *Garner* — used the case to explain that all claims asserting the use of excessive force by law enforcement officers "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than [as some Federal courts of appeals had done] under a 'substantive due process' approach." *Id.* at 395. It takes a considerable feat of extrapolation to take the brief caveat in *Dalia* and join it to an analogy to *Garner* in order to arrive at the conclusion the judge reached here.

This is not to say that we doubt that the mode of the execution of a search warrant does not fall under the "reasonableness standard." Just last year in *Wilson* v. *Arkansas*, 514 U.S. 927 (1995), a unanimous Supreme Court finally held that the failure to knock and announce might cause an otherwise valid search to violate the Fourth Amendment's requirement of reasonableness, where there is no reason to believe such an announcement would be a fruitless gesture, endanger the lives of the persons executing the search, or lead to the destruction of evidence. *Id.* at 935-936. The Supreme Court came to this conclusion after a meticulous historical analysis focusing on the special significance the common law had long assigned to the knock and announcement. *Id.* at 934-936. In this case, of course, there is no issue regarding knock and announcement, since the police officers had obtained a no-knock warrant. As the occupants of the premises were reasonably considered heavily armed and vicious, the judge found this warrant to be valid and justified.

The Federal Courts of Appeals cases referred to by the judge and Garner's brief do not significantly advance Garner's

case either. *United States* v. *Baker,* 16 F.3d 854 (8th Cir. 1994), did make reference to the use of "distraction devices" similar to the one used here. But the court held that the warrant was reasonably executed because "the officers acted pursuant to express no-knock authority . . . [and] the police had particularized, timely information justifying a no-knock entry." *Id.* at 856. In *Baker,* the police had information that the front door of the house was barricaded and there were two Doberman pinscher dogs inside; thus, the finding that "the police reasonably believed the use of distraction devices was needed to effect a safe entry was not clearly erroneous." *Id.* The other case urged below and to this court, *United States* v. *Stewart,* 867 F.2d 581 (10th Cir. 1989), provides even less support for the judge's decision. In *Stewart,* the police, who were investigating a drug-dealing operation and executing a Federal search warrant,

> "used a two-man steel battering ram to break down the front door [of a residence] and immediately threw a full charge stun grenade into the living room, where it detonated (as the officers stood back) with an explosion and flash. The occupants were blinded and disoriented for at least five or ten seconds. There was no knock and no warning before the door was broken down and the grenade was detonated. There were three people in the living room at the time, the defendant, a co-defendant and a woman who had no connection with any illegal activity. The co-defendant was slightly injured. . . . There was no testimony that anyone had seen a gun in the house before the search. There were no other facts known to the police that would have led to the inference that firearms were present in the house."

*Id.* at 583. Continuing its discussion of the circumstances of this search, the court stated — and this loomed large for the judge below — that "[t]he officers had no reason to think that the house was barricaded and indeed it was not barricaded." *Id.* The sole ground for suppression of the evidence obtained in *Stewart* was the officers' failure to follow the dictates of 18 U.S.C. § 3109, which required "prior notice of authority and purpose before forcing entry into a home," *id.* at 584, quoting *Miller* v. *United States,* 357 U.S. 301, 313 (1958), as well as

the absence of any "information that would have led [the officers] to believe that the defendant armed himself on a regular basis," *id.* at 585, thus providing no basis to believe that there was any exigency to justify departure from § 3109's procedures.[5]

## B

In spite of this paucity of Federal precedent, we do not doubt that an unreasonable execution of a warrant may violate the Fourth Amendment. But the execution was not unreasonable here. The judge emphasized that:

> "no effort was made to determine whether the apartment was barricaded or fortified, or if the occupants of the home were monitoring the area for police activity. There was no indication that a hostage situation existed or that any activities within the apartment were endangering its inhabitants. In short, the officers did not possess information that warranted the strength of the police assault on the premises."

With respect, the conclusion does not follow. The door to the apartment was not barricaded and there was no reason to believe that it was. This is a factor considered in the *Stewart* case with regard to the use of a battering ram. Whatever the significance of the absence of this factor and the others mentioned by the judge below, it is swamped by the very

---

[5]Reference was also made to United States *vs.* Green, No. 93-1284 (10th Cir. May 17, 1994), an unpublished decision. Unpublished decisions are specifically stated to lack precedential effect by rule of that court. Rule 36.3 of the Rules of the Tenth Circuit (1996). In that case, a forced entry was accompanied by the use of a diversionary devise. The court held that there were sufficient exigent circumstances to justify an unannounced entry and use of the device, since the police "were informed that a gun had been seen in the apartment twenty-four hours earlier . . . [and that] cocaine was kept in a bedroom of the house." The court did note that there was no evidence to support the contention that the use of the flash-bang device was "excessive force rendering the search unreasonable. No one was injured. No children were present." Thus the court may be taken to assume that the presence of children might be evidence of excessive force. Of course such a factor does not make the use of the device unreasonable per se. Although we take the facts as found by the judge, the judgment of unreasonableness is reviewed de novo. *United States* v. *Moland* 996 F.2d 259, 260 (10th Cir. 1993), cert. denied, 510 U.S. 1057 (1994).

strong grounds the police had for believing the occupants of 1261 Church Street were armed and vicious. Garner, himself, was believed to be armed with a sawed-off shotgun — a particularly lethal weapon when used at close range. (This weapon is surely as deadly as the Dobermans in *Baker, supra.*) A surprise entry with overwhelming force, accompanied by a strong and stunning diversion, may well have seemed the best way to avoid a deadly gun battle. True, it cannot be said that the methods used were, in the judge's words, "*necessary,* and thus reasonable conduct, to effect a safe entry into the dwelling" (emphasis supplied). The police might have secretly surrounded the apartment and waited until Garner left. Or they might have taken a chance on a less dramatic and less overwhelming show of force. But these are exactly the kinds of speculations that we must not engage in under the aegis of determining whether police action in executing a valid no-knock warrant was reasonable in the circumstances. The question is not whether the methods of the police entry were "necessary," but whether they were reasonable.

This leaves the one issue that was certainly uppermost in the judge's mind when he deemed the search unreasonable: The police knew or should have known that two children and a pregnant woman were present in the apartment. Even worse is the fact that one of the children was in the room into which the diversionary device was thrown. Because no evidence was offered to the contrary, the judge inferred that the officer who threw the device did not look into the room before his throw, even though he had been instructed to do so. Faced with the weaponry and dispositions of the suspects inside the apartment, we think it parses a frightening situation too fine to fault the officer for not looking, or if he had looked, for not seeing the child after he broke the window and before he threw in the device. Although the stun grenade may be dangerous, it is important to recall that it is not intended to be. It is reusable and intended to frighten and distract. The judge found that the child sustained emotional injuries as a result of the assault and was treated a few days later "for a health complaint associated with smoke inhalation." The entry in force would have been frightening even if the device had been detonated down a hallway. And so, it must be said, would have been a gun battle in which police officers or one of the bystanders might have been shot or killed. As to the

child's physical symptoms, the judge specifically found that the device "filled the apartment with smoke," making it probable that the use of the device anywhere in the apartment would have had similar effects. Once the decision to enter was made, the use of the device within the apartment cannot be described as an unreasonable part of a plan designed to get the operation over with as quickly as possible and to minimize the possibility of a gun battle that might have been truly lethal. While it is regrettable that the device was deployed in a room where the little girl happened to be, it cannot be said to have contributed greatly to the inherent dangerousness of the situation as a whole, nor indeed to whatever ill effects she suffered.

### C

Before the single justice and on argument to this court, Garner urged us to adopt a rule of practice for the Commonwealth that would require the police to seek prior judicial authorization for the use of the flash-bang device discussed here, in much the same way that we have long required explicit authorization for no-knock entries under a warrant. *Commonwealth v. Rodriguez*, 415 Mass. 447 (1993). *Commonwealth* v. *Scalise*, 387 Mass. 413 (1982). We decline to do so. As the Supreme Court demonstrated in *Wilson* v. *Arkansas*, 514 U.S. 927, 931-936 (1995), the knock and announce procedure is an ancient and distinct requirement for the execution of a warrant. The stun grenade, by contrast, is just one of many modes and devices by which an entry may be effected in a variety of difficult and dangerous circumstances. That we now have this particular device before us is not a good enough reason to single it out and fashion a new rule of procedure in respect to it. To fashion a proper response to the problems presented by this one device would require us either to undertake a survey of other devices and procedures which may present similar or greater hazards, or to fashion some rule of such generality as would accomplish little but breed litigation, or finally to require the police, where possible, to submit their plans for forcible entries in detail for prior approval by a judicial officer. This would embark our judiciary on an enterprise for which we are ill equipped by training or experience, and thus quite different from those cases where we have adopted such practice rules.

See, e.g., *Commonwealth* v. *Rosario,* 422 Mass. 48, 56 (1996) (adopting rule under which otherwise admissible statements made in response to police questioning will not be excluded if made within six hours of arrest); *Commonwealth* v. *Ortiz,* 422 Mass. 64 (1996) (same); *Ciummei* v. *Commonwealth,* 378 Mass. 504, 509-510 (1979) (rule requiring judge in criminal case to hold a colloquy with defendant to ensure waiver of right to trial is made voluntarily and intelligently).

The order allowing the defendant's motion to suppress is vacated and an order denying the motion is to enter. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*