897 A.2d 1104 (2006)
385 N.J. Super. 518
STATE of Ne
v.
Michael R. FANELLE, Sr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 14, 2005.
Decided May 22, 2006.
*1105 Grimes & Grimes, attorneys for appellant (Joseph P. Grimes, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Natalie A. Schmid Drummond, Deputy Attorney General, of counsel and on the brief).
Before Judges WEFING, FUENTES and GRAVES.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Defendant was indicted for two counts of possession of a controlled dangerous substance with intent to distribute, a crime of the third degree, N.J.S.A. 2C:35-5a(1); two counts of possession of a controlled dangerous substance, a crime of the third degree, N.J.S.A. 2C:35-10a(1); and one count of fourth-degree possession of a controlled dangerous substance, N.J.S.A. 2C:10a(3). After the trial court denied his motion to suppress, defendant entered a negotiated plea of guilty to one count of possession of a controlled dangerous substance with intent to distribute. The trial court sentenced defendant to four years on probation, conditioned on serving 364 days in the county jail. The trial court specified in its sentence that the period of incarceration be served at the end of the probationary term and that if defendant had successfully completed probation, the sentence of incarceration would be vacated. Defendant has appealed from the denial of his motion to suppress. R. 3:5-7(d). After reviewing the record in light of the contentions advanced on appeal, we reverse and remand for further proceedings.
On July 9, 2003, Officer Stephen Wenger of the Burlington Township Police Department applied for a search warrant to search defendant's residence at 18 Pinewald *1106 Lane in Burlington Township. Officer Wenger supported his application with a detailed six-page affidavit, which included the following information. He noted that defendant had been arrested twenty-one times; eleven of these were for narcotics violations. Defendant had four criminal convictions, including one for aggravated assault upon a police officer.
His affidavit included a detailed physical description of the premises and its surrounding structures, including such details as defendant's pool containing a Harley Davidson logo on the bottom. It noted that Wenger was familiar with defendant through prior contacts and that he had observed defendant in the company of motorcycle club members, including the club "Breed."
Wenger's affidavit set forth the following factual background. On or about May 18, 2003, a "concerned citizen" contacted Wenger. The individual told Wenger that he/she wished to remain anonymous because the individual feared retaliation. The individual told Wenger that the traffic into and out of defendant's residence had increased. This individual also told Wenger that defendant had told neighbors that he had lost his business and was selling drugs to replace the income he had lost. This individual also told Wenger that defendant had a new girlfriend.
During the weekend of June 1, 2003, Wenger spoke with another "concerned citizen" who also wished to remain anonymous because of the fear of retaliation. This individual told Wenger that she was concerned about her husband, who had, in the past, had a drug problem. She told Wenger that she was familiar with the signs of methamphetamine use because of her husband's prior drug use and that her husband had recently displayed symptoms indicating such use. She said that she had confronted her husband, who admitted purchasing a gram of methamphetamine from defendant and consuming it.
On June 22, 2003, Police Officer Carey met with defendant's new girlfriend, Rebecca Sternotti. Ms. Sternotti told Officer Carey that she and defendant had recently returned from a trip to Florida and that defendant had a large quantity of methamphetamine and marijuana stored in the house, the garage and his automobile, a Cadillac Escalade. She supplied the name, address and phone number of Michael Schoppe of Philadelphia, with whom she said defendant was dealing in narcotics. Officer Wenger was familiar with Schoppe through prior narcotics investigations. Schoppe had been arrested five times in New Jersey for narcotics violations and had been convicted in Pennsylvania on a narcotics charge. Officer Wenger's follow-up investigation confirmed Schoppe's address supplied by Sternotti, but not the telephone number.
Two days later, on June 24, Wenger was again contacted by the concerned citizen who had initially contacted him in May. This individual told Wenger that defendant had recently returned from a trip to Florida and that the traffic in and out of defendant's residence had increased significantly, at all hours of the day and night.
Wenger also set forth the location and physical layout of defendant's residence and why those made it difficult, if not impossible, to place the premises under surveillance. Wenger also noted that because defendant would only sell narcotics to people close to him, it was not possible to set up an undercover buy.
Wenger specifically requested in his affidavit the authority to execute the warrant at any hour and without the necessity for the police to knock and announce their presence.
*1107 In addition to the material contained in the balance of his affidavit, Wenger included the following information in support of a "no-knock" warrant.
It is virtually impossible to approach the house without being observed by occupants of the house. There is a driveway that is approximately 50 yards long leading from the street to the gate. In addition, the house is located some 50 feet from the gate. The gate is closed and must be opened by someone in the house or by a pass code. A tall fence surrounds the house and this fence would inhibit access to the house. In addition to the house, there is also a pool house and a detached garage that may possibly contain additional persons and must be simultaneously secured.
Wenger also noted that, although he had probable cause to believe a search would reveal a large quantity of narcotics, it was being sold in small amounts, facilitating its quick destruction.
After reviewing Officer Wenger's affidavit, the trial court issued the requested warrant. It included authorization to execute the warrant without the necessity of the police first knocking and announcing their presence, noting "assaultive background; multiple involvement with criminal justice system" as the basis. The warrant provided that it could be executed between the hours of 4:00 a.m. and 11:00 p.m.
The Burlington police executed the warrant at approximately 5:00 a.m. on July 11, 2003. Defendant was not present at the time, nor was the Escalade in which Sternotti had told Wenger defendant was storing methamphetamine. Defendant's seventeen-year-old son was at home, however.
In conjunction with the no-knock provision, the police entered the premises with the aid of what the parties refer to variously as a "stun-grenade" or a "flashbang" device. Although the record contains no details of the particular device used, it was allegedly of sufficient temperature to burn holes in a rug and percussive force to rupture the speakers in a television set. The police searched the residence and found within the young man's room a burnt marijuana cigarette and a glass pipe that smelled of burnt marijuana.
The police were accompanied by a dog trained in the detection of drugs; the dog reacted to a locked safe discovered in the master bedroom and a Lincoln Mark VIII automobile. That car, however, was registered in the name of defendant's former girlfriend and had not been mentioned in the warrant. Defendant arrived home while the police were still searching the premises. He was placed under arrest and in a search incident to his arrest, the police discovered two Xanax pills, a quantity of rolling papers and $1,501.80 in cash. The police informed defendant they were awaiting a locksmith to open the safe and that he could, in the interim, consent and open the safe himself. He elected the latter course. Inside the safe the police found three bags of methamphetamine, two bags of marijuana, two used pipes and plastic baggies of a type frequently used to package drugs. The police towed the Lincoln Mark VIII to police headquarters and obtained a warrant to search the vehicle. During that search, the police found a plastic bag containing marijuana and another plastic bag containing blunt wraps. Defendant's indictment followed.
Defendant moved to suppress the physical evidence seized. He presented three main arguments in support of his motion: that the affidavit submitted in support of the application for a warrant was false and misleading; that there was no basis for a "no-knock" warrant; and that the manner in which the police executed the warrant, with their use of a "flash-bang" device, was unreasonable, and thus the fruits of the *1108 search should be suppressed. The trial court rejected each of these arguments and denied defendant's motion.
In support of his first contention, defendant asserted that Wenger's affidavit was false and misleading because it did not disclose that defendant's conviction for aggravated assault upon a police officer occurred more than twenty years earlier and that defendant and the concerned citizen who reported the increase in traffic to defendant's house had been engaged in a long-standing dispute. Nor did it disclose that the Burlington police had responded to defendant's house at least twenty-nine times between May 12, 1999, and July 11, 2003, upon complaints of various types and had encountered no difficulty on any of those earlier occasions. Defendant asserted that including those facts in Wenger's affidavit would have provided a more accurate picture to the trial court when it considered whether to issue the warrant and whether to dispense with the requirement they knock and announce their presence before entering.
We are satisfied the trial court correctly rejected defendant's argument in this regard. Our Supreme Court has recently restated the principles which must guide our analysis of defendant's challenge.
It is well settled that a search executed pursuant to a warrant is presumed to be valid and that a defendant challenging its validity has the burden to prove that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable. In considering such a challenge, we accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant. Thus[,] when the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant, and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search.
[State v. Jones, 179 N.J. 377, 388-89, 846 A.2d 569 (2004) (internal quotations and citations omitted).]
We note initially that the record does not indicate whether defendant's identification of the concerned citizen who spoke with Officer Wenger was, in fact, correct, although the State did not specifically dispute that assertion during the argument below, nor did it indicate whether its silence was an attempt to assure the anonymity of the concerned citizen.
Further, in reviewing the many earlier visits of the police to the premises, it is apparent that on many of these occasions, the police were summoned to provide assistance; examples include seeking assistance locating a missing vehicle, assistance with an intoxicated spouse, assistance in enforcing a restraining order; assistance with a head laceration. That the police may have encountered no difficulty in such situations does not forecast the probable response to executing a search warrant.
Nor are we persuaded by defendant's reference to the age of his conviction for aggravated assault upon a police officer. Defendant has supplied to the court an incomplete copy of his arrest history; the summary notes four felony convictions. Although there is a gap of some years between defendant's 1982 arrest for aggravated assault upon a police officer and his next reported arrest in 1991, the record before us does not disclose when defendant was convicted for that offense and whether he spent any time in custody as a result. Defendant's arrest for that offense occurred in the latter part of 1982, and his next arrest occurred in the spring of 1991. Without such information, we decline to draw the favorable inferences defendant seeks. It is clear, moreover, that commencing in 1991, defendant has been arrested *1109 with some regularity. While most of the offenses were narcotics-related, other offenses included hindering apprehension, receiving stolen property and multiple charges of harassment.
The Supreme Court rejected a similar argument in Jones, supra, in which the defendant had been arrested seven years earlier for assault upon a police officer. 179 N.J. at 384, 846 A.2d 569. The police in Jones had included that arrest as one of the elements supporting their request for a no-knock warrant. Ibid. This court rejected that assertion, describing the arrest as stale. State v. Jones, 358 N.J.Super. 420, 435, 818 A.2d 392 (App.Div.2003), rev'd, 179 N.J. 377, 846 A.2d 569 (2004). The Supreme Court disagreed, noting that the arrest was "properly used to support a reasonable suspicion to believe that the officer's safety would be compromised without a no-knock entry. Past evidence of violent criminal behavior, particularly behavior directed towards law enforcement officers, is plainly probative of the heightened risk posed to officer safety." 179 N.J. at 402, 846 A.2d 569 (internal quotations and citations omitted).
Nor are we persuaded by defendant's assertion that the no-knock provision was unjustified. The Supreme Court addressed the threshold requirements for a no-knock warrant in State v. Johnson, 168 N.J. 608, 775 A.2d 1273 (2001). There, the Court stated that "the task of courts evaluating the propriety of a no-knock provision is to determine whether the applying officer has articulated a reasonable suspicion" to believe the no-knock provision is appropriate. Id. at 618, 775 A.2d 1273. Factors that may support a no-knock warrant include the physical layout of the property in question, id. at 620, 775 A.2d 1273, and reasonable concern for officer safety. Id. at 624, 775 A.2d 1273.
First, to justify a no-knock warrant provision, a police officer must have a reasonable, particularized suspicion that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence. Second, the police officer must articulate the reasons for that suspicion and may base those reasons on the totality of the circumstances with which he or she is faced. Third, although the officer's assessment of the circumstances may be based on his or her experience and knowledge, the officer must articulate a minimal level of objective justification to support the no-knock entry, meaning it may not be based on mere hunch.
[Id. at 619, 775 A.2d 1273.]
Having reviewed Wenger's affidavit, we are satisfied that the physical layout of the property, combined with the ease with which evidence could be destroyed and defendant's prior criminal record, provided a sufficient basis to authorize a no-knock warrant.
Defendant's final contention is that the use of the "flashbang" device was so unreasonable in the situation presented that the evidence seized during the search should be suppressed. There are two aspects to defendant's argument: that the use of such a device was unreasonable in the present situation and that because of the inherent dangers the use of such devices present, police should be required to obtain prior judicial approval before using one while executing a warrant.
Although our research has not led us to a reported New Jersey opinion dealing with the use of such devices, courts in other jurisdictions have considered the consequences of the use of such devices during the execution of a warrant. Because the question has not been addressed in a reported opinion in New Jersey and because we have determined that a remand is necessary, we review those decisions *1110 for the guidance of the trial court on remand. We confine our review to reported matters involving motions to suppress. Several courts have dealt with the use of such devices in subsequent civil suits for damages, an issue not before us. Kirk v. Watkins, 182 F.3d 932 (10th Cir.1999); Molina v. Cooper, 325 F.3d 963 (7th Cir. 2003).
The question came before the Massachusetts Supreme Judicial Court in Commonwealth v. Garner, 423 Mass. 735, 672 N.E.2d 510 (1996). Defendants in that case were charged with rape and robbery that had occurred in a convenience store at 3:00 a.m. Id. at 511. Later, the police learned that a woman identified as Sharon Hubbard had tried to cash lottery tickets that had been taken in the robbery, and they obtained a warrant to search her apartment. Ibid. While they were conducting their search, she told the police that defendants had visited her approximately one hour after the robbery and had cash, lottery tickets and two rings which corresponded to jewelry taken from the victim of the rape. Ibid. She also told the police that one of the defendants had a sawed-off shotgun, the other, a handgun. Ibid.
Based upon the information she provided, the police obtained a no-knock warrant to search the apartment of defendant Derek Garner. Ibid. In addition to knowing the general layout of Garner's apartment, they were also aware that a pregnant woman and her two young children might be present in the apartment. Ibid. The officer in charge of executing the warrant stationed a number of officers, including sniper teams outside. Id. at 511-12. He instructed another officer to break a window in a rear bedroom, believed to be occupied by adults, look into the room and then detonate a flash-bang device. Id. at 512. In fact, a four-year-old child was in that bedroom. Ibid. As soon as the device was detonated, the apartment filled with smoke and the police rushed in. Ibid. In their search they found a sawed-off shotgun, ammunition, and jewelry and clothing they thought connected to the convenience store robbery. Ibid. Several days later, the child was taken for treatment for problems alleged to be associated with smoke inhalation. Ibid.
Defendants moved to suppress the evidence uncovered in the search, and the trial court granted the motion. Ibid. Based upon the testimony presented at the motion, the trial judge inferred that the officer had disregarded the instruction to look into the room before detonating the device; he found that the manner in which the police executed the warrant was unreasonable under the circumstances. Id. at 513. The Supreme Judicial Court, although it recognized that the "unreasonable execution of a warrant may violate the Fourth Amendment," id. at 515, nonetheless, reversed, stressing that the police knew the defendants to be armed and vicious and that the risk to the child was less than that posed by a gun battle between police executing a warrant and armed, dangerous criminals. Ibid.
Significantly, in that case, as opposed to this, the court had a record of the nature of the device the police had used. According to testimony at the motion hearing, the device was a metal cylinder which contained black powder and a small amount of magnesium that when detonated, produced a loud noise, equivalent to an M-80 firecracker and a big flash. Garner, supra, 672 N.E.2d at 512 n. 1. It was intended to be reusable and was not designed to cause injury or damage although the State conceded that its misuse could lead to either. Ibid.
Here, on the other hand, there was no testimony at all about the specifics of the particular device the police used. The assistant *1111 prosecutor and defense counsel each had different contentions as to level of risk posed by such devices. Indeed, they did not even agree on what to call the device, the assistant prosecutor referring to it as a "flash-bang", defense counsel as a "stun grenade" or a "concussion grenade." In our review of the case law, the term "flash-bang" appears to be the term most commonly used, and we have, accordingly, adopted it for purposes of this opinion.
Shortly after Massachusetts upheld the use of flash-bang devices, the question was presented to the Court of Appeals for the Tenth Circuit, in United States v. Myers, 106 F.3d 936 (10th Cir.), cert. denied, 520 U.S. 1270, 117 S.Ct. 2446, 138 L.Ed.2d 205 (1997). In that case, the police obtained a warrant to search the defendant's premises, believing he was engaged in a largescale indoor marijuana growing operation. Id. at 938. They knew that defendant had prior convictions, and that his juvenile record revealed that he had been involved in a firebombing and had been convicted of possessing an unregistered firearm and a firebomb. Ibid.
The police executed the warrant a few minutes after 6:00 a.m. Id. at 939. After battering down the door, they used a flash-bang device. Ibid. When they entered, they found the defendant, his wife, his nineteen-year-old stepson, his nine-year-old stepdaughter and seventeen-month-old daughter. Ibid. After noting its concerns, the court rejected the defendant's challenge to use of this device. Id. at 940.
The use of a "flash-bang" device in a house where innocent and unsuspecting children sleep gives us great pause. Certainly, we would not countenance the use of such devices as a routine matter.... However, we also recognize that we must review the agents' actions from the perspective of reasonable agents on the scene, ... who are legitimately concerned with not only doing their job but with their own safety.
[Ibid.]
The Court of Appeals for the Seventh Circuit has addressed the use of flash-bang devices on several occasions. In United States v. Jones, 214 F.3d 836 (7th Cir. 2000), the police suspected the defendant was engaged in the narcotics trade and obtained a warrant to search his home. Id. at 837. The defendant did not dispute the validity of the warrant itself but the manner in which the police executed it. Ibid. When they arrived at his home, they knocked loudly and announced their presence. Ibid. When they received no response, one of the officers tried the door and discovered it was unlocked. Ibid. Ibid. The police then applied a battering ram. After the door flew open, one of the officers looked into the living room. Ibid. When he saw no one, he threw in a flash-bang device, which detonated. Ibid. When the police entered the room, they saw the defendant some twenty feet from the door; when he did not respond to a command, the police tackled him to the floor. Ibid. Although the court's opinion does not indicate the time the police arrived to execute the warrant, it does note that they knew that the defendant's girlfriend and her young child would be present. Ibid.
The court declined to find that the use of such a device was objectively reasonable. Id. at 837-38. Indeed, it indicated substantial discomfort at what had occurred.
[P]olice cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism "flash-bang device." The police did not believe that Jones was an unusually dangerous drug dealer.... Police had little reason to apply a battering ram to a door that was already ajar, and using the concussion grenade created a risk that people close to the detonation point would be *1112 injured. Children are especially vulnerable and the officers knew that one was in the apartment. Although they peeked inside the living room, planning not to use the device if they saw the child, they could have missed someone in a corner or behind the furniture. A child who hears the door being broken down is likely to hide.
[Ibid.]
Despite its misgivings, the court affirmed the trial court's denial of defendant's motion to suppress. The court reached its conclusion, not because it necessarily considered the use of a flash-bang device appropriate in the situation presented but because the court was convinced its use did not lead to the seizure of evidence. Id. at 838.
A warrant authorized the entry, so seizure of evidence was inevitable.... The principal function of a concussion grenade is to protect officers from weapons fire, not to uncover evidence otherwise concealed. An argument that the suspects would have destroyed the drugs, if only they had more time and full possession of their faculties, is not a good reason to suppress probative evidence of crime.
[Ibid.]
That court followed the same approach in United States v. Folks, 236 F.3d 384 (7th Cir.), cert. denied, 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). In that case, the police arrived at approximately 12:40 a.m. to execute a search warrant connected with a narcotics investigation. Id. at 387 n. 1. In connection with that, they used a flash-bang device described as a large firecracker inside a metal housing. Although the court noted that the use of such devices had in some cases resulted in injury, it relied on the inevitable discovery doctrine and declined to suppress the weapons and narcotics that were uncovered. Id. at 388. The court did note in a footnote the care the police used before detonating the device, including looking to see that no one was in the immediate vicinity and carrying a fire extinguisher in case any fire did result. Id. at 388 n. 2. Here, the record before us is silent in those regards.
In United States v. Morris, 349 F.3d 1009 (7th Cir.2003), the police obtained a warrant to search premises they believed were being used as a base from which to sell drugs. Id. at 1011. Approaching the building, they found a round of ammunition in the trash. Ibid. In executing the warrant, the police used two flash-bang devices, one before entering the building itself and the second prior to entering the basement, from which they could hear voices. Ibid. Before using the first device, they checked that the living room was unoccupied; before dropping the second into the basement, they inquired whether children were present and were told none were. Ibid. In the course of their search, they uncovered a quantity of guns and ammunition as well as narcotics and narcotics paraphernalia. Ibid. The defendant did not dispute the police use of the first flash-bang device but did contend that it was unreasonable to use the second. Id. at 1012. Although the court noted "the dangerous nature of flash-bang devices" it also affirmed the trial court's denial of defendant's motion to suppress, noting that the defendant could "not show that the use of the flash-bang device caused the discovery of the guns or his inculpatory statements." Id. at 1012-13.
Because of the paucity of the record before us, we decline at this juncture to affirm the trial court's ruling upon the basis of the inevitable discovery doctrine. State v. Holland, 176 N.J. 344, 823 A.2d 38 (2003). In our judgment, the use of such a device, when challenged, requires a more detailed presentation than defendant's motion received. There are various factors in *1113 the record before us which could tend to support the use of such a device here, as well as factors tending to indicate that its use was not warranted. We are aware from our own research that there are a number of such devices, with varying strengths and capabilities. The particular weight to be ascribed to particular factors may well be affected by the details of the device that was used. "[T]he method of an officer's entry into a dwelling `is an element of the reasonableness inquiry under the Fourth Amendment.'" Johnson, supra, 168 N.J. at 616, 775 A.2d 1273 (quoting Wilson v. Arkansas, 514 U.S. 927, 934, 115 S.Ct. 1914, 1918, 131 L.Ed.2d 976, 982 (1995)). We are unable to conclude that the actions of the police in using this device were either objectively reasonable or unreasonable in the situation presented when we have no factual information about the particular device in question or the manner in which it was used. A remand is thus appropriate.
The second prong to defendant's argument is, as we have noted, that the evidence seized should be suppressed because the police did not obtain prior judicial approval for the use of a flash-bang device in executing the warrant. We reject this contention. We agree with the views expressed by the Massachusetts court in Garner, supra, when the same argument was pressed before it.
[T]o require the police, where possible, to submit their plans for forcible entries in detail for prior approval by a judicial officer ... would embark our judiciary on an enterprise for which we are ill equipped by training or experience....
[Garner, supra, 672 N.E.2d at 516.]
Reversed and remanded for further proceedings consistent with this opinion.