960 A.2d 825 (2008)
404 N.J. Super. 180
STATE of New Jersey, Plaintiff
v.
Michael R. FANELLE, Sr., Defendant.
INDICTMENT NO. 03-11-1544.
Superior Court of New Jersey, Law Division, Criminal Burlington County.
Decided July 16, 2008.
Michael V. Luciano, Assistant Prosecutor, for plaintiff (Robert D. Bernardi, Burlington County Prosecutor, attorney).
*826 Kevin Walker, Assistant Deputy Public Defender, for defendant (Yvonne Smith Segars, Public Defender, attorney).
MORLEY, J.S.C.

I.
In this case, remanded by the Appellate Division, State v. Fanelle, 385 N.J.Super. 518, 897 A.2d 1104 (App.Div.2006), the court must determine whether "the actions of the police in using [a flash-bang] device[1] [(also known as a flash/sound device, a distraction device or.a percussion grenade) during the execution of a no-knock search warrant] were ... objectively reasonable or unreasonable in the situation presented." Id. at 533, 897 A.2d 1104.
At the outset of the remand hearing, the State suggested that this court's mandate was limited to determining whether the characteristics of the particular device employed made its use unreasonable. The State also argued throughout the hearing that any determination as to the reasonableness of the manner in which the search warrant was executed must be based solely on the facts underpinning the appellate findings as to the sufficiency of probable cause and justification for the no-knock provision. Thus, the State objected vigorously and repeatedly to the court's ruling that it would hear evidence expanding on the facts as had been found in the initial motion to suppress and upon which the Appellate Division relied.
Those arguments were rejected because, in remanding for further proceedings, the Appellate Division had lamented the "paucity of the record," id. at 533, 897 A.2d 1104, that left it with "no factual information about the particular device in question or the manner in which it was used." Ibid, [emphasis added.]

II.
The search warrant in this case, which was signed on July 9, 2003, contained a noknock provision, due to what the issuing judge described as defendant's "assaultive behavior [and] multiple involvement with [the] criminal justice system" as alleged in the affidavit. And, although he denied a request that police be permitted to execute the warrant at any time, the judge did authorize its execution as early as 4 a.m.
Before executing the warrant, Burlington Township Police Officer Stephen Wenger, the affiant, contacted David Meyer, who was then a sergeant in the New Jersey State Police and the supervisor of its Technical Emergency and Mission Specialists (TEAMS) Unit. According to Wenger, it was his practice to contact the State Police for assistance whenever executing a search warrant, and he had been assisted by the TEAMS unit for that purpose on approximately twenty-five previous occasions.
The TEAMS Unit is a highly selective entity whose members are trained in the use of shotguns, carbines, sniper rifles, semi-automatic weapons and submachine guns. TEAMS personnel are used for a variety of tasks, including underwater search, rope rescue and crowd control, and employ in their work gas and flash-bang devices, including the Def-Tech M25 used in this case. The use of flash-bang devices may be authorized in advance of an operation, or they may be deployed in response to circumstances that develop during the course of an operation.
Sometime prior to the execution of the warrant on July 13, 2003, Wenger met with an advance team sent by Meyer. Although *827 Wenger testified at the remand hearing that he could recall only that he had shown the troopers the search warrant itself, sketched the layout of the first floor of defendant's home based on observations during a single visit at least four years earlier, and accompanied them on a driveby the location, he had no recollection of having shown the advance team the affidavit in support of the warrant or having discussed with them, either at his initiative or theirs, any of the details of the case, most significantly, any facts that might bear on the decision to deploy a flash-bang device.
Other evidence, however, permits the conclusion that Wenger had, in fact, shared the affidavit with the State Police. For example, although he could not recall having discussed with them defendant's alleged association with motorcycle gang members, that fact was cited by the State Police as a factor supporting use of the flash-bang. If Wenger had not discussed the issue with them, their knowledge had to be based on the statement in the affidavit.
Wenger did inform the State Police advance team that there were one large and two small dogs on the property, but there is no evidence that he told them anything about their dispositions; in fact, the TEAMS entry plan, discussed further below, reports that the dogs' "[t]emperament [was] unknown." Nor is there any evidence that he informed the State Police of what he testified to at the hearing: that he had no knowledge of any reports of violence by defendant or of the presence of any weapons in his home. Those were particularly glaring omissions in light of the fact that, despite the Burlington Township Police's having been called to defendant's home frequently, including on twenty-nine occasions between April 1999 and July 2003, on none of them did he present any problem to the police, and on some of them the police had been summoned by defendant himself.
Following the meeting with Wenger, the advance team prepared an "entry plan" that was reviewed and modified by Meyer. The entry plan, consistent with TEAMS procedures, outlined how State Police personnel would enter and secure the house, although they would have no role in the execution of the warrant, and authorized the use of flash-bang devices. The plan cited four factors in the section entitled "Caution Statement": (1) defendant's prior arrests for controlled dangerous substances and aggravated assault; (2) his being a "[k]nown affiliate" of the Breed, an "outlaw" motorcycle gang; (3) "[unknown weapons," and; (4) the presence of three dogs. In the section entitled "Possible Hazards" there was a check in the box next to the word "fortifications." The plan also contained the following "Hazard Comments": "Unknown layout of residence. Possibility of several transients at location. Two small dogs and a large dog at location. Temperament unknown."
The search warrant was executed around 5 a.m. on July 11, 2003. Approximately twenty-nine law enforcement officers were on the scene; in addition to personnel from the Burlington Township Police Department, there were fifteen or sixteen TEAMS officers, two or three State Police canine handlers with dogs, a representative from the county prosecutor's office and one from the Drug Enforcement Administration.
One unit of TEAMS personnel was assigned to each of the two entrances to the residence.[2] Each unit formed a column, *828 led by the officer responsible for breaking down the door with a ramming device.
Once the front door had been breached, the second officer in that column threw a Def-Tech M25 distraction device into the living room, which was carpeted and contained area-rugs, upholstered furniture with throw pillows, and fabric window treatment. As other officers entered through the front door, one of them opened the door leading to the basement and deployed another identical device. Meyer, who was approximately the seventh man in the column that entered the front door, could not recall at the remand hearing whether there was any light in the living room when the first device was thrown. But it is clear that the second was dropped into a staircase, from the top of which there was no view of any area of the basement below. There is some evidence that a third device may have been deployed.[3]
The device thrown into the living room burned a hole in the carpet and melted the speakers on a large-screen television. The other caused a burn to the floor-covering at the bottom of the basement stairs. Although neither device started a fire, none of the police had brought any fire-suppression equipment to the house, despite the fact that many of them had extinguishers in their vehicles.
The unit that entered the house from the rear found itself immediately in a stairway leading to the attic, in which had been constructed a suite of rooms then occupied by defendant's teenage son, who was sleeping. The son was awakened by two loud "booms" and two or three "bangs" and discovered in his room two or three men, dressed in black and wearing helmets. At least one of the men was armed with a submachine gun, which was pointed at defendant's son.
The son was ordered to the floor while his hands were placed in restraints behind his back. Dressed only in boxer shorts and a sleeveless tee-shirt, he was led downstairs to the kitchen, where he sat for at least thirty minutes on a folding chair while the premises were searched; he was given pants to wear only after he asked for them. When he arrived downstairs, there were twenty-five to thirty officers inside the house, which was very smoky, even though the doors were open, and the carpet in front of the television in the living was smoldering.
At the time the officers made their entry, defendant's son was the only person in the house. Also present were two small dogs, each no more than sixteen inches long and twelve inches high, who were restrained by being placed in a Jacuzzi tub, into which the searching officers also deposited the contents of a linen closet. The third dog, about two feet in height and weighing about seventy pounds was, as normal, caged elsewhere on the property.

III.
The Def-Tech M25 consists of a gunsteel cylinder, approximately five to six inches in length, and one and one-half to two inches in diameter. The cylinder, which may be used up to twenty-five times, is perforated to allow the release of exhaust. For each use, the cylinder is loaded with an explosive, connected to a three-second fuse, which, when detonated, triggers an explosion similar in force to that of a large firecracker, and is intended to cause disorientation so startling that it regularly causes domestic animals to defecate. It also produces a flash, milliseconds in duration, which causes temporary blindness. *829 The device does not emit any projectiles, but does give off sparks and cardboard debris from the container of the explosive charge.
State Police witnesses also testified that, because an exploding M25 can cause retinal burns, TEAMS personnel are trained to look away when one is being deployed, and that the sparks emitted from the device are capable of igniting combustible materials. According to literature issued by the manufacturer, because the device is capable of causing significant property damage, fire suppression equipment should be available nearby whenever one is used. The manufacturer also warns that, because the M25 is so dangerous, if one fails to detonate, it should be left alone for sixty minutes and then approached with five gallons of water by persons using eye, ear and hand protection.
A witness offered by defendant, qualified as an expert in the cause and suppression of fires, testified that devices like the M25 present such a substantial risk of confined conflagration when deployed near rugs or stuffed furniture that extinguishers should be available nearby. In fact, at a demonstration of distraction devices by the Federal Emergency Management Agency witnessed by the expert, law enforcement personnel were cautioned to bring fire suppression equipment to the point of deployment. The expert also opined that, as was the case here, it is not sufficient precaution to have extinguishers in the trunks of the vehicles in which the police had arrived.

IV.
The record contains no evidence that the State Police had a written protocol for the use of flash-bang devices at the time the ones in this case were deployed. The State Police did, however, produce in response to subpoena a document entitled "Flash/Sound Diversionary Devices," which recites that its "purpose ... is to establish policy regarding the use of flash/ sound diversionary devices." Although no witness could definitively identify the source of the document or its date of creation, Meyer acknowledged that it characterized generally the policy governing the use of such devices as he understood it to be in 2003.
The policy provides that:
Circumstances justifying the use of [the] devices shall include, but not be limited to:
[1] Barricaded suspect and/or hostage situations[;]
[2] High-risk warrant services (intelligence information indicates violent offenders, presence of firearms, fortified structures[,] etc.)[;]
[3] Circumstances wherein distraction of violent mentally deranged persons or those under the influence of alcohol/drugs is believed necessary in order to facilitate apprehensionf;]
[4] Situations wherein the T.E.A.M.S. Unit supervisor or any trained authorized user deems their use necessary to safely resolve the incident[;]
[5] Situations involving the presence of aggressive canine[s] that exhibit behavior threatening to unit personnel.
Among other "Deployment Considerations" described in the policy is the caution that
[i]t is incumbent on the trooper deploying [a] device to identify any potential hazards in the intended target area. Because flash/sound diversionary devices have the potential to ignite flammable materials, a portable fire extinguisher or other means of fire suppression shall be readily accessible whenever devices are to be deployed.

*830 V.
As reiterated by the Appellate Division in State v. Robinson, 399 N.J.Super. 400, 413, 944 A.2d 718 (App.Div.2008), when police executing a search warrant issued without a no-knock provision fail to knock and announce their presence, it is their burden to prove that their actions were reasonable in order to sustain the search and avoid suppression of the evidence seized. There, in a case involving the use a flash-bang device in the execution of a knock-and-announce warrant, the panel observed in dictum that "there is a rational nexus between the use of a flashbang device ... and an entry by force... authorized by a no-knock warrant." Id. at 416-17, 944 A.2d 718.
Still, while reaffirming that "[i]t is neither wise nor practical for judges to involve themselves in the tactical decisions of law enforcement agencies," id. at 417, 944 A.2d 718, the Robinson panel recognized that, even in a no-knock case, the use of a flash-bang device is subject to subsequent judicial review "to ensure compliance with relevant legal standards." Ibid.
Thus, this court must determine whether the police have carried their burden of proving that, having been authorized to enter defendant's home before sunrise without knocking and announcing their presence, it was reasonable under the circumstances to deploy at least two flash-bang devices. In order to do so, the court relies on such facts as it is able to find based on the record at the remand hearing, recognizing that in many instances either the affiant, the State Police, or both, may not have been aware of those facts. Nevertheless, and without attributing ill motive to any officer, the court finds that, in its evaluation of the reasonableness of the conduct of the police, they must be held responsible for knowledge of any facts that were available to any of them with the exercise of due diligence.

VI.
The entry plan for execution of the warrant cited circumstances that the State might argue supported deployment of the flash-bang device under three of the categories delineated in the State Police policy: (a) a high-risk warrant service, (b) situations involving aggressive canines, and (c) situations in which deployment is deemed necessary "to safely resolve the incident."

a.
The policy defines a high-risk warrant service as one which, on the basis of intelligence information, suggests that officers might confront "violent offenders, firearms, fortified structures," or other unspecified dangers. In this regard, the entry plan refers to several factors.
First, the plan cites defendant's history of arrests for controlled dangerous substances and aggravated assault. There was considerable dispute at the remand hearing about the details of defendant's prior criminal record, and Wenger was unable to produce the computerized criminal history upon which he based the assertion in the affidavit about defendant's prior record. Nevertheless, the court is able to conclude that, even if there was, in fact, a conviction for assaulting a police officer,[4] it had occurred more than twenty years before issuance of the search warrant here. In addition, with the exception of a conviction for possession of over 25 grams of marijuana in 1975, for which defendant received a suspended indeterminate sentence and two years of probation, all of his *831 subsequent CDS-related charges involved either less than 50 grams of marijuana or drug paraphernalia. Apparently, the only offense involving a weapon for which defendant had been convicted was the unlicensed purchase or sale of a firearm in 1975. Among several other municipal court charges on defendant's record, the only possible conviction arguably involving any degree of violence had occurred in 1991, when a charge of terroristic threats was downgraded to "inconvenient annoyance."
Second, with respect to firearms, the entry plan did not cite any intelligence information supporting any level of suspicion that they might be present. Indeed, it confessed to a lack of knowledge as to the presence of any weapons.[5] And, again, the only arguably relevant entry on defendant's criminal record was a firearms regulatory violation twenty-eight years earlier, not the use or possession of a firearm, or other weapon, for any unlawful purpose.
Third, the reference to "fortifications" on the entry plan has no foundation whatsoever in the record.

b.
The entry plan cited the presence of three dogs of "[t]emperament unknown." This information certainly does not establish, as required by the policy governing the use of flash-bang devices, "the presence of aggressive canine[s] that exhibit behavior threatening to unit personnel." Indeed, even if the policy could be construed to permit use of the devices in advance of actually being confronted by aggressive canines, the record here is devoid of evidence relevant to such a determination. Information to fill that void, and to inform the police as to the size of the dogs and where they were housed, might have been obtained from defendant's girlfriend, who had provided other information critical to the probable cause for the warrant. But nothing in the record suggests that any law enforcement officer ever attempted to do so.

c.
The plan cited a number of other factors in support of the decision to use the flash-bang devices. The court has considered these under the provision in the policy that permits deployment when necessary to "safely resolve [an] incident," even though it believes a fair reading of that provision is that it is intended to address responses to circumstances that were not anticipated during the planning of an operation.
First, the plan referred to defendant as a "[known] affiliate" of the Breed. But while Wenger denied having characterized defendant as such, he could not recall having disclosed that the entire basis of his reference to motorcycle gang connections in the affidavit was a single pool party at defendant's home at which were observed an unspecified number of vehicles registered to Breed members.
Second, as a possible hazard, the plan cited the "[u]nknown layout of [the] residence." But, just as regarding the dogs on the premises, the court heard no explanation of why relevant information was not sought from defendant's girlfriend.
Third, although the entry plan cited the "[p]ossibility of several transients at [the] location," it did not identify the source of that information, and the court is unable to *832 divine how that fact, even if true, might bear on the decision to deploy the devices.

VII.
A witness offered by defendant, qualified as an expert in police practices and procedures, offered his opinion that the deployment of the flash-bang devices was not justified under the circumstances described in the testimony. In addition, and even more significant, were the concessions of both Meyer and Lieutenant Douglas Hildebrandt, a former head of the TEAMS Unit, that had they been aware of all of those circumstances, they would have deemed the use of the devices unnecessary.
Therefore, the court is constrained to conclude that the deployment by the police of at least two grenades under commandoraid-like conditions, based in part on information that was incorrect or incomplete, and otherwise on willful ignorance of relevant facts that were readily available, was, under the totality of the circumstances, unreasonable. Therefore, the evidence seized from defendant's home must be suppressed.

VIII.
Violations by the State Police of their own policy governing the manner in which flash-bang devices should be deployed provide an independent basis for suppression of the evidence.
The "Deployment Considerations" in the State Police policy described above required that TEAMS personnel "identify any potential hazards in the intended target area." There is no evidence in the record, however, that any effort was made to fulfill this responsibility, even though again, defendant's girlfriend, who had provided information included in Wenger's affidavit, was familiar with the premises. And, even if the court assumed that, in the moments before deployment of the first device, there was enough natural light provided by the first rays of dawn to allow split-second identification of potential hazards, no amount of light would have permitted any assessment of the target area beyond the bottom of the blind basement stairway, into which the second device was thrown.
The "Deployment Considerations" also required that a "means of fire suppression... be readily accessible whenever devices are ... deployed." Although the term "readily accessible" is not defined in the policy, other evidence in the record permits a finding that portable fire extinguishers in the trunks of police vehicles do not satisfy that requirement.
For these reasons, the court concludes that the manner of deployment created an unnecessary potential risk to persons and property and was, therefore, unreasonable under all of the circumstances.

IX.
Although the inevitable discovery doctrine was asserted by the State before the Appellate Division, it was not argued on remand and, therefore, has not been considered by this court.
NOTES
[1] Although it became obvious during the remand hearing that more than one device was used, that fact was apparently not evident in the record available to the Appellate Division.
[2] Presumably, municipal officers were responsible for entering the out-buildings.
[3] Both Meyer and defendant's son testified to this possibility.
[4] In the "Prior Court History" of the presentence report prepared in this case after defendant had pled guilty, there is no reference even to an arrest for that crime.
[5] The evidence and testimony presented by the State concerning weapons found at defendant's home during execution of the warrant are immaterial to this inquiry because they were not firearms and, in any event, as depicted in the photographs of his bedroom, were mounted as decorative items.