944 A.2d 718 (2008)
399 N.J. Super. 400
STATE of New Jersey, Plaintiff-Respondent
v.
James ROBINSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted January 23, 2008.
Decided April 15, 2008.
*720 Yvonne Smith Segars, Public Defender, for appellant (Kevin G. Byrnes, Designated Counsel, on the brief).
Joshua M. Ottenberg, Special Deputy Attorney General, Acting Camden County Prosecutor, for respondent (Laurie A. Corson, Special Deputy Attorney General, Acting Assistant Prosecutor, of counsel and on the brief).
Before Judges COBURN, FUENTES and CHAMBERS.
The opinion of the court was delivered by FUENTES, J.A.D.
A jury convicted defendant James Robinson of one count of third-degree possession of cocaine, N.J.S.A. 2C:35-10a(1), two counts of third-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5b(3), and second-degree possession of cocaine with intent to distribute within 500 feet of a public housing complex, N.J.S.A. 2C:35-7.1. The court sentenced defendant to an extended term of fifteen years imprisonment with five years of parole ineligibility, concurrent to an extended term of seven years imprisonment, three years to be served without parole.
Defendant appeals, and we reverse because the police tactics in executing the knock-and-announce search warrant violated defendant's rights under Article I, paragraph 7 of the Constitution of the State of New Jersey.
In executing a knock-and-announce warrant, the police must give the occupants of the dwelling a reasonable opportunity to respond before resorting to the use of force to gain entry to the residence. Under the circumstances presented, the police *721 by breaking down the entrance door of the dwelling, twenty to thirty seconds after announcing their presence converted the knock-and-announce warrant into a de facto no-knock warrant. This constituted a violation of a material condition imposed by the court, rendering the search unreasonable and unconstitutional. Furthermore, the use of a so-called flash bang explosive device by the police here was factually unwarranted, and rendered a nullity the warrant's knock-and-announce condition imposed by the court. Under these circumstances, the trial court erred in denying defendant's motion to suppress the evidence gathered by the police while executing the warrant.

I

The Investigation
The State's case against defendant began as part of an investigation into illicit drug sales in Camden County. The Camden County Prosecutor's Office (CCPO) initially targeted defendant James Robinson, and a woman identified as Diane Winter. Specifically, the CCPO received intelligence, gathered by confidential informants, that illicit narcotics were being sold from a private residence located in the Borough of Pine Hill. CCPO Investigator Robert Ferris was assigned to work as an undercover officer with the High Intensity Drug Trafficking Area unit.
On December 10, 2003, Borough of Pine Hill Detective Jack Welker showed Ferris a photograph of both Diane Winter and James Robinson and gave him sixty dollars to purchase "any CDS." In response, Ferris went to a residence located at 12 Wilson Road in Pine Hill. The residence is located 150 feet from a public park named the Mayor Steven Wills Playground. Ferris arrived at the residence at about 8:05 p.m. Once inside, he met with Winter and asked her to sell him three bags of crack cocaine; Winter responded by placing a telephone call to an individual subsequently identified as "Manny." At approximately 9:00 p.m. the person identified as "Manny" arrived at the house. Ferris immediately recognized the man calling himself "Manny" as defendant James Robinson.
When defendant asked Ferris what he needed, Ferris replied "three," referring to bags of cocaine. Defendant then produced three bags from his inner coat pocket and handed them to Ferris, who gave him thirty dollars in exchange. Ferris then left the residence, and linked up with his backup unit at a predetermined location. Once there, Ferris dated and initialed the three bags, and turned them over to Welker. He also viewed defendant's photograph again to confirm that the individual who had just sold him three bags of cocaine was defendant. Ferris then signed the photo, and printed his name and badge number on it. The contents of the three bags tested positive for cocaine. At trial, Ferris identified both the photograph and the three bags of cocaine, based on these identifying markings.

II

The Search
Welker and Ferris submitted a joint affidavit in support of an application for a warrant to search defendant's apartment. The affidavit referred to two confidential informants identified as PH-24 and PH-25, who had gathered information on defendant's drug activities. Specifically, PH-24 accompanied Ferris when he made his controlled purchase of cocaine from defendant on December 10, 2003, at 12 Wilson Road. PH-25 met with the investigators on January 5, 2004 to arrange a second controlled buy from defendant at defendant's apartment located in the Village *722 Green Apartments, Borough of Hi-Nella. PH-25 carried out the second illicit transaction under a police-controlled process. He was searched to insure that he was not concealing contraband, and was then provided with the currency to buy the drugs. Although the two illicit sales occurred in different locations, the description given by PH-25 of how the actual transaction was consummated was factually similar to the account given by Ferris of the first controlled buy.
The search warrant issued by the court specifically required the police to first knock on the door of defendant's residence, identify themselves as police officers, and announce their intended purpose to search the apartment. The joint affidavit submitted by the police in support of the issuance of the search warrant did not mention or even allude to defendant's propensity for violence, or of the violent tendencies of other likely occupants of the residence. The affidavit is equally devoid of any information referring to the possible presence of weapons in the residence. In short, the affidavit did not alert the judicial officer reviewing the application that the police had reason to believe that the execution of the warrant could expose the officers involved to an exceptionally dangerous situation.
At approximately 6:30 a.m., on January 16, 2004, the police executed the search warrant. Detective Sergeant Leonard Check, of the Berlin Township Police Department, described what transpired at the evidentiary hearing conducted by the trial court to consider defendant's motion to suppress.
DIRECT EXAMINATION
Q. Okay. And Zone 4 tactical team, what was the team's role in executing this particular search warrant?
A. What our tactical team does is, we get called out to execute any type of high-risk warrant where they think there might be, you know, a propensity for violence or something like that. They call the tactical team out for that.
So our role is to go into a location, secure everyone in the location, make the scene safe, and then turn the location over to investigators.
Q. And how many officers were part of this particular tactical team?
A. Thirteen.
Q. Was there a team briefing before the warrant was executed?
A. Yes. The briefing took place at Pine Hill Police Department.
Q. And what was the purpose of the briefing?
A. The briefing was to give the information of the exact location to team members, information of possible occupants in the dwelling. The team leader at that time puts the team members in specific locations and gives those guys specific duties for that, you know, specific entry.
Q. Okay. And what was your duty for this particular entry?
A. My duty was to make a knock and announce at the residence because it was a knock and announce warrant.
Q. Okay. And when you arrived on the scene and before this warrant was executed, did you in fact knock and announce your presence?
A. Yes, I did.
Q. Okay. And when you knocked, you knocked on F-3, Village Green Apartments?
A. Yes.
Q. Okay.
A. As soon as we made entry, there was an entry door, made entry through the main entry door and then the apartment *723 door was to the left. I knocked and announced on the apartment door prior to entry.
Q. Okay. And when you knocked and announced your presence, what exactly did you say?
A. Police department; search warrant.
Q. Did anybody answer the door at that point?
A. No.
Q. Okay. And what did you do after no one answered the door?
A. We waited approximately 20, 30 seconds. The door was forcibly breached, and then we deployed a percussion grenade inside the door.
Q. I'm sorry go ahead.
A. We deployed a distraction device inside the doorway.
Q. And what distraction device was that?
A. The distraction device, it emits smoke and also a loud bang and a loud flash.
Q. Okay. And what's it called?
A. It's a distraction device or also known as a flash bang.
Q. Okay. And can you explain how it works?
A. Yeah. it's like you pull a pin and you release it right inside the doorway maybe one or two feet inside the doorway. And in approximately two seconds it goes off and emits a loud flash, loud bang, and smoke. It gives the members of the team a surprise to the occupants of the dwelling so we can get in safely, get through the doorway safely and secure everyone in there.
Q. Now you testified that you've executed over a hundred search warrants. Is a flash bang always used when executing search warrants?
A. No, it's not primarily used.
Q. Why was it used in this case?
A. At the briefing we had information that the occupant of the dwelling's nephew sometimes stays with him and he operates a blue Crown Victoria with tinted windows.
DEFENSE COUNSEL: Judge I'm going to object to 
THE COURT: Okay. This is beyond the point of anything. I'll sustain the objection.
CROSS-EXAMINATION
Q. Okay. And you said you that you threw some type of 
A. I didn't. I didn't throw it, the team did. A member of the team threw it.
Q. And what was the purpose of throwing it?
A. The purpose of throwing that was to give the members of the tactical team  it's to make the occupants of the dwelling a little bit shocked so we can enter the dwelling safely if we feel that there may be more violence inside.
Q. Okay. And you testified earlier that you first knocked, right?
A. Yes, sir.
Q. And you also testified that the reason for that device is to give  so the team can surprise someone. Is that correct?
A. Correct.
Q. How do you surprise them when  if you already knocked?
A. That's why we use it; because we do knock. They know we're there, so we try to give a little bit more of a shock and surprise to make the team make entry after the knock.
There were four adults inside the apartment when the police detonated the flash bang device: defendant, his girlfriend, Myra Ramirez, and two other unidentified *724 persons. No weapons were found; from all accounts, the occupants of the residence did not offer any physical resistance to the police or otherwise interfere with the execution of the search warrant. Inside the apartment, the officers found a quantity of cocaine, $4124 in cash, a ledger and a black scale. All of the cocaine was found on the person of Myra Ramirez. The money was found in defendant's jeans, which were in his bedroom.
Defendant was arrested and transported to the Pine Hill Police Department. Welker informed defendant of his rights under Miranda;[1] he did not question him, however, because defendant told him he did not wish to speak to the police at that time. According to Welker, as defendant was walking to the processing room, defendant told him that "he didn't want his girlfriend to go to jail, and the drugs that were found on her were his." The police characterized defendant's statement as spontaneous and unsolicited.

III

Legal Analysis
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]
We now address the argument raised by defendant challenging the court's decision to admit the evidence gathered by the police in connection with the execution of the warrant to search defendant's residence. The trial court denied defendant's motion to suppress after hearing the testimony of one of the officers who executed the warrant. As a threshold issue, we reject defendant's argument that the warrant was not supported by probable cause.
A probable cause determination is based on the totality of the circumstances. State v. Jones, 179 N.J. 377, 389, 846 A.2d 569 (2004) (quoting Schneider v. Simonini, 163 N.J. 336, 361, 749 A.2d 336 (2000)). "Information related by informants may constitute a basis for probable cause, provided that a substantial basis for crediting that information is presented." Ibid. (citing State v. Sullivan, 169 N.J. 204, 212, 777 A.2d 60 (2001); State v. Smith, 155 N.J. 83, 92, 713 A.2d 1033 cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L.Ed.2d 480 (1998)). The joint affidavit presented by the State in support of the application for the issuance of the warrant provides sufficient, detailed information to establish that defendant's residence was being used for distributing cocaine.
Our concern here is centered on the execution phase of the search warrant as that may impact on the reasonableness of the search itself. It is well-settled, that "the method of an officer's entry into a dwelling `is an element of the reasonableness inquiry under the Fourth Amendment,'" and its New Jersey State Constitution analog. State v. Johnson, 168 N.J. 608, 616, 775 A.2d 1273 (2001) (quoting Wilson v. Arkansas, 514 U.S. 927, 931, 115 S.Ct. 1914, 1916, 131 L.Ed.2d 976, 980 (1995)).
Defendant's challenge to the search of his home on the grounds that the methods employed by the police to gain entry were so unreasonable that they warrant the suppression of the evidence gathered therefrom comes before us in a bifurcated fashion. The execution of the knock-and-announce provision in the warrant was directly raised before the trial court. The propriety of the police using a so-called "flash bang" explosive device immediately *725 upon entering the home, was raised before us in defendant's appellate brief.
We are satisfied, however, that these issues substantially implicate the public interest, and are so interrelated, that a proper examination of their legal significance cannot be done in isolation from each other. See State v. Walker, 385 N.J.Super. 388, 410, 897 A.2d 411 (App.Div.), certif. denied, 187 N.J. 83, 899 A.2d 305 (2006) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 300 A.2d 142 (1973); Ferraro v. Demetrakis, 167 N.J.Super. 429, 431-32, 400 A.2d 1227 (App.Div.), certif. denied, 81 N.J. 290, 405 A.2d 834 (1979)).
We begin our analysis by emphasizing that nothing in the joint affidavit in support of the issuance of the warrant reveals a concern by the State that the search of defendant's residence presented an unusually dangerous situation. Despite the absence of any indication of potential danger in the joint affidavit, it is clear that the officers who executed the warrant did not consider this situation as ordinary.
From its inception, the officers involved viewed this mission as a potentially dangerous operation, requiring a military-style tactical approach. As Sergeant Check testified:
What our tactical team does is, we get called out to execute any type of high-risk warrant where they think there might be, you know, a propensity for violence or something like that. They call the tactical team out for that.
This specialized team, consisting of thirteen officers from various law enforcement agencies, is designed to aggressively secure the targeted area, using both a tactical deployment of personnel and force. From the perspective of the magistrate who issued the warrant, it seems to us that this highly aggressive posture by the police was not anticipated or warranted. It must be emphasized, that the warrant here required the police to: (1) knock on the door of the residence; (2) announce their identity; and (3) state the reasons for their presence. These requirements serve a three-fold purpose:
(1) "[decreasing] the potential for violence, as an `unannounced breaking and entering into a home could quite easily lead an individual to believe that his safety was in peril and cause him to take defense measures'" (2) "[protecting] privacy by minimizing the chance of entry of the wrong premises and subjecting the innocent persons to `the shock, fright or embarrassment attendant upon an unannounced police intrusion,' and even when there is no mistake, allow[ing] those within a brief time to prepare for the police entry"; and (3) "[preventing] the physical destruction of property by giving the occupant the opportunity to voluntarily admit the officer into his home."
[State v. Bilancio, 318 N.J.Super. 408, 417-18, 724 A.2d 278 (App.Div.), certif. denied, 160 N.J. 478, 734 A.2d 793 (1999) (alteration in original) (quoting 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure (1984) § 3.4(h)).]
In Johnson, supra, the Court noted that "to pass muster under the knock-and-announce rule, the time lapse between the police announcement and any forced entry must be reasonable but not necessarily extensive in length, depending on the circumstances of a given case." 168 N.J. at 621-22, 775 A.2d 1273.
We recently had occasion to review the "time lapse" between the police announcement and forced entry, in the context of an execution of a knock-and-announce warrant. In State v. Rodriguez, the police had information that illicit narcotics were located in a third floor apartment. 399 N.J.Super. 192, 404, 943 A.2d 901 (App. *726 Div.2008). Armed with a knock-and-announce warrant, the police arrived at this location at 8:18 a.m., and took the following actions:

Officer Smith testified that he knocked three times in succession and waited ten or fifteen seconds. Upon receiving no response, Officer Smith knocked three times again, this time yelling "police, search warrant." Again, there was no response, and, after fifteen or twenty seconds, the police entered through this unlocked door. Officer Smith yelled "police" at least three times as he and the others entered.
The door opened into a vacant kitchen. From there the police entered the living room where Jameel Griggs  the man known as "Groove" for whom the police were searching  was sleeping on a couch. Griggs awoke and lifted his head; Officer Smith indicated he had a search warrant for the apartment. Officer Smith then entered a bedroom. There, Lashawanda Williams, defendant, and a small child were in bed. According to Officer Smith, it appeared "they had been sleeping and just woke up." The police searched the apartment and found CDS in the bedroom, near the bed where defendant was awakened when the police entered.
[Id. at 404-05, 943 A.2d 901 (emphasis added).]
After reviewing the applicable case law, the panel in Rodriguez concluded that the actions taken by the police in executing the warrant did not violate the knock-and-announce restriction.
Here, the police executed the search on a Wednesday, a short time after 8:00 a.m., when the police could reasonably expect that anyone inside would be up and about. It is also reasonable to expect the police to wait a longer period of time before entering when the premises are large as opposed to an apartment or hotel room. In this case, the breach was of a two-bedroom apartment, and, thus, what constitutes a reasonable wait time would be shorter here than a large or multi-story home, although perhaps not as short as what would be reasonable if the premises was a hotel room.
[Id. at 410, 943 A.2d 901.]
Finally, addressing the amount of time the police waited before entering the apartment, the panel concluded that "although close to or at the limit of what constitutes a reasonable wait time in these circumstances," the total amount of time that transpired between the first knock and actual entry (thirty to forty seconds) was reasonable. Id. at 410-11, 943 A.2d 901.
Here, the facts are sharply different from those addressed by the court in Rodriguez. In this case, the officers arrived at defendant's residence at 6:30 a.m. According to Sergeant Check, they knocked on the door, announced their presence and purpose, then, after waiting for just twenty or thirty seconds, they "forcibly breached" the door, and deployed a "percussion grenade" inside.
There is no justification in the record before us for such extreme measures. Given that it was 6:30 a.m., it is entirely reasonable to expect that it might take a person more than thirty seconds to wake up, put on an item of clothing, and walk an unknown distance to answer the door. Under these circumstances, waiting just twenty to thirty seconds before forcibly breaking down the door of a residence renders the search facially unreasonable, and practically nullifies the knock-and-announce condition specifically imposed by the court.
We recognize, however, that even in cases where the warrant specifically requires the officers to knock and announce their presence, exigent circumstances may *727 necessitate entry of a dwelling by force without first securing specific judicial authorization to do so. Johnson, supra, 168 N.J. at 617-18, 775 A.2d 1273 (quoting Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421-22, 137 L.Ed.2d 615, 624 (1997)). In such a case, the burden is upon the police officers to show that the circumstances were such that announcing their presence, as required by the warrant, would have been dangerous, futile, or would have inhibited the effective investigation of the crime. Ibid.
Here, the only evidence showing the circumstances facing the police at the time they arrived at defendant's residence came from the testimony of Sergeant Check. From this evidence, it is clear that the police were predisposed to the use of force from the moment the decision was made to deploy the tactical team. Nothing in Check's testimony indicates that the officers executing the search warrant were responding to an unforeseen dangerous condition, or that their mere presence had compromised the effectiveness of the investigation.
All of the evidence thus leads to one conclusion: the officers gave the knock-and-announce requirement in the warrant only perfunctory consideration. The decision to gain entry by force had been reached long before the officers arrived at defendant's residence. Under these circumstances, the judicial restriction was rendered a nullity, converting the police's actions into a warrantless invasion of defendant's dwelling, requiring the suppression of any evidence gathered therefrom.
We recognized that since our State Supreme Court's decision in Johnson (upholding the suppression of evidence gathered in violation of the knock-and-announce rule), the United States Supreme Court decided Hudson v. Michigan, 547 U.S. 586, 594, 126 S.Ct. 2159, 2165, 165 L.Ed.2d 56, 66 (2006), holding that the exclusionary rule cannot be invoked in response to a police entry in violation of the knock-and-announce rule. Writing for a plurality of the Court,[2] Justice Scalia noted:
One of [the] interests [protected by the knock-and-announce rule] is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. Another interest is the protection of property. Breaking a house (as the old cases typically put it) absent an announcement would penalize someone who "`did not know of the process, of which, if he had notice, it is to be presumed that he would obey it. . . .'" The knock-and-announce rule gives individuals "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." And thirdly, the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the "opportunity to prepare themselves for" the entry of the police. "The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to [put] on clothes or get out of bed." In other words, it assures the opportunity to collect oneself before answering the door.
What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant. Since the interests that were violated in this case have nothing to do *728 with the seizure of the evidence, the exclusionary rule is inapplicable.

[Id. at 594, 126 S.Ct. at 2165, 165 L.Ed.2d at 66 (emphasis added) (internal citations omitted).]
Writing in dissent on behalf of himself and three other members of the Court, Justice Breyer wrote:
Today's opinion is [] doubly troubling. It represents a significant departure from the Court's precedents. And it weakens, perhaps destroys, much of the practical value of the Constitution's knock-and-announce protection.
. . . .
Without such a rule, . . . [the] police know that they can ignore the Constitution's requirements without risking suppression of evidence discovered after an unreasonable entry.
[Id. at 605, 609, 126 S.Ct. at 2171, 2174, 165 L.Ed.2d at 73, 76 (Breyer, J., dissenting)]
Fortunately for the residents of our State, we need not decide which side of this debate accurately reflects and safeguards the concerns expressed by our nation's founders when they adopted the Fourth Amendment, because, "Hudson by no means governs the application of our [S]tate [C]onstitution to a knock and announce violation." Rodriguez, supra, 399 N.J.Super. at 412, 943 A.2d 901.
As our Supreme Court clearly stated in Johnson, supra:
[W]e note for completeness that our disposition [suppressing evidence gathered in violation of the knock-and-announce rule] is required under both the Fourth Amendment and the analogous provision in the New Jersey Constitution. Although our disposition is consistent with federal jurisprudence, we also conclude that the no-knock entry was impermissible on State constitutional grounds for the reasons already stated. See State v. Cooke, 163 N.J. 657, 666, 751 A.2d 92 (2000) (outlining those occasions in which "this Court has interpreted our State Constitution as affording its citizens greater protections than those afforded by its federal counterpart").
[168 N.J. at 625-26, 775 A.2d 1273.]
Thus, our holding here suppressing the evidence gathered by the police in violation of the knock-and-announce rule is exclusively grounded on Article I, paragraph 7 of our State Constitution.

IV

Flash Bang Device
The use of the "percussion grenade" or "flash bang" device here presents an independent, and arguably more significant basis for invalidating the search. State v. Fanelle, 385 N.J.Super. 518, 897 A.2d 1104 (App.Div.2006) is the only reported decision in this State that has addressed the use of this type of tactical explosive device. The facts presented to the magistrate who issued the search warrant in Fanelle are in sharp contrast to the facts we confront here.
In Fanelle, we sustained the authorization for a no-knock warrant based on: (1) the physical layout of the targeted property; (2) the ease with which the evidence could be destroyed; and (3) the danger posed by defendant's history of violence, as reflected in his criminal record. Id. at 528, 897 A.2d 1104. The configuration of the structures made it "virtually impossible to approach the house without being observed by [its] occupants." Id. at 523, 897 A.2d 1104. There were also structures detached from the main dwelling which were being used to store contraband. Id. at 522, 897 A.2d 1104. Thus, the police needed to coordinate simultaneous entries from different locations. Id. at 523, 897 *729 A.2d 1104. All this made it highly likely that evidence would be destroyed without a no-knock authorization. Ibid.
On the question of the danger posed to the officers, Fanelle had a well-documented history of violence; he had been arrested twenty-one times; had eleven narcotic convictions, and one conviction for assaulting a police officer. Id. at 522, 897 A.2d 1104. In this light, we upheld the trial court's issuance of the no-knock warrant. Id. at 528, 897 A.2d 1104.
Concerning the use by the police of the flash bang device, we reviewed the published opinions from other jurisdictions that have addressed the use of these devices in executing a warrant.[3]Id. at 528-33, 897 A.2d 1104. In each of the cases examined, the police had either secured a no-knock warrant, or otherwise gained entry by force. Id. at 529-31, 897 A.2d 1104. Thus, it seems obvious to us, that there is a rational nexus between the use of a flash bang device, and an entry by force, whether expressly authorized by a no-knock warrant, or otherwise required by exigent circumstances.
A no-knock warrant permits, by definition, the use of force to enter a dwelling. Its legal legitimacy is derived from the notion that the "no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence." Johnson, supra, 168 N.J. at 619, 775 A.2d 1273. The flash bang device is thus a tactical expression of the force authorized by the no-knock entry; it is one of many possible forceful means the State is authorized to use in connection with an unannounced entry. Stated differently, the use of a flash bang device is antithetical to and irreconcilable with the public policy grounds supporting a knock-and-announce warrant. See Bilancio, supra, 318 N.J.Super. at 418, 724 A.2d 278.
We thus hold that absent unforeseen exigent circumstances supporting the use of force, the use of a flash bang device in connection with the execution of a "knock-and-announce" warrant, nullifies the legal efficacy of such warrant, rendering the entry and search of the dwelling unconstitutional, in violation a defendant's rights under Article I, paragraph 7 of the Constitution of the State of New Jersey.
Our analysis would be deemed incomplete, however, if we were to end our discussion without giving some guidance to the trial courts on how to address issues dealing with the use of this explosive device. In Fanelle, supra, we specifically rejected the notion that the police need to obtain prior judicial approval for the use of a flash bang device. 385 N.J.Super. at 533-34, 897 A.2d 1104.
We reaffirm that holding here. It is neither wise nor practical for judges to involve themselves in the tactical decisions of law enforcement agencies. Our role is to review the actions taken by law enforcement officials to ensure compliance with relevant legal standards. In order to make this assessment, a reviewing court must create a thorough and comprehensive record. As we noted in Fanelle:
[T]he use of such a device, when challenged, requires a more detailed presentation than defendant's motion received. There are various factors in the record before us which could tend to support the use of such a device here, as well as factors tending to indicate that its use was not warranted. We are aware from *730 our own research that there are a number of such devices, with varying strengths and capabilities. The particular weight to be ascribed to particular factors may well be affected by the details of the device that was used.
[Id. at 533, 897 A.2d 1104.]
Specifically, among the factors a reviewing court should consider are: (1) does the law enforcement agency have a protocol (written or oral) governing the use of the flash bang device; (2) if so, is the protocol sufficiently sensitive to constitutional considerations involving the use of force to obtain entry into a dwelling; and (3) if the protocol is constitutionally acceptable, were the actions taken by the officers in compliance with it. This, by no means, constitutes an exhaustive list of the possible issues to be addressed. The analysis and issues addressed will ultimately depend on the facts of the particular case.
The reviewing court should also keep in mind the inherently dangerous nature of a flash bang device. As the Ninth Circuit Court of Appeals noted in Boyd v. Benton County, "it cannot be a reasonable use of force under the Fourth Amendment to throw a flash bang device `blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." 374 F.3d 773, 779 (9th Cir.2004).

V

Conclusion
The order of the trial court denying defendant's motion to suppress the evidence gathered by the police in connection with the execution of the knock-and-announce search warrant is reversed. Consequently, defendant's conviction is reversed, and the matter is remanded for a new trial.
Reversed and remanded.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Three other Justices joined Justice Scalia's opinion. Justice Kennedy filed a separate opinion concurring with the end-result reached by Justice Scalia.
[3] We specifically declined to consider the use of flash bang devices in the context of civil trials brought by plaintiffs who have been injured by the device. Id. at 529, 897 A.2d 1104.