958 A.2d 110 (2008)
403 N.J. Super. 321
Philip D. D'AMBROSIO, Petitioner-Appellant,
v.
DEPARTMENT OF HEALTH AND SENIOR SERVICES, Respondent-Respondent.
No. A-0914-07T3
Superior Court of New Jersey, Appellate Division.
Submitted October 6, 2008.
Decided October 29, 2008.
*112 Stuart J. Moskovitz, Freehold, for appellant.
Anne Milgram, Attorney General, for respondent (Melissa Raksa, Deputy Attorney General, of counsel; Kimberly E. Jenkins, Deputy Attorney General, on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
Petitioner Philip D. D'Ambrosio, an emergency medical technician ("EMT"), appeals a final agency decision by the Department of Health and Senior Services ("the Department") that denied his recertification as an EMT-Basic ("EMT-B") for a period of five years. The Department's sanction was predicated upon a finding by an Administrative Law Judge ("ALJ") that petitioner had purposely altered and forged his name on records to make it appear that he had attended mandatory continuing education classes required for his recertification. Petitioner appeals the sanction and argues that there was an insufficient factual basis to support the allegation that he acted improperly.
Petitioner further alleges, for the first time on appeal, that the Department has no authority to regulate him or other EMT-Bs because the provisions of the Emergency Medical Services Act, N.J.S.A. 26:2K-7 to -53 (the "EMS Act"), and the corresponding Departmental regulations, do not apply to that particular category of EMTs. Rather, petitioner contends that it is the local municipality's exclusive responsibility to regulate EMT-Bs, based on provisions of the New Jersey Highway Traffic Safety Act of 1987, N.J.S.A. 27:5F-13.1 to -43 (the "Traffic Safety Act").
We affirm.

I.
Petitioner has been a volunteer EMT with the Fanwood Rescue Squad for nearly thirty-five years. As a volunteer, petitioner has received an EMT certification from the National Registry of Emergency Medical Technicians ("NREMT"), as well as from the State of New Jersey through the Department's Office of Emergency Medical Services ("OEMS"). The State's certification lasts for three years, and EMTs must complete a cycle of continuing education courses within that three-year period to be recertified for another three years. Prior to 2003, petitioner had never been denied either national or State recertification.
After petitioner's EMT-B State certification expired on December 31, 2003, he was not recertified because OEMS lacked documentation that he had completed the requisite number of continuing education classes. Specifically, according to OEMS records, petitioner did not take required courses seven, eight, nine and twelve.[1] To be eligible for recertification, petitioner *113 needed to take those classes within the time frame of his "recertification cycle," which was January 1, 2001 to December 31, 2003. Classes petitioner took prior to January 2001 would not have counted towards his recertification.
The Department's EMT recertification process warrants some description. All of the courses administered must be approved by OEMS. Each class is assigned a course number, which corresponds to the year that the course is offered and whether it is a "core" or an "elective" course. The middle two digits represent the retraining requirement involved (e.g. "07" or "12"). Attendees typically sign their names on a sign-in sheet at the start of each training class. This sheet also contains the date of the course and the course number. It is then collected by the course instructor at the end of class. The instructor signs the sheet and mails it, or a copy of it, to OEMS. OEMS logs the information from the sign-in sheets onto its computer database, keeping track of which EMTs have attended which courses. From this database a computer printout is generated for each EMT detailing the classes he or she has taken and any courses still needed to complete the recertification cycle.
Petitioner's wife, Nancy D'Ambrosio, is also a long-time EMT and a former captain of the Fanwood Rescue Squad. In her capacity as the squad's training officer, and after realizing he had never received his recertification card, Mrs. D'Ambrosio contacted OEMS in February 2004 and inquired about her husband's recertification status. She learned from Jeffrey Egnatovich, a public health representative with OEMS, that its records showed petitioner had not attended the requisite number of classes. Mrs. D'Ambrosio then offered to fax to Egnatovich copies of sign-in sheets for classes that she claimed her husband had attended. As the rescue squad's training officer at the time, Mrs. D'Ambrosio customarily retained copies of class attendance sheets for her records.
Egnatovich received two documents via fax from Mrs. D'Ambrosio. The first was a photocopy of a sign-in sheet with a handwritten date of "11/14/2001," and with a course number, also in handwriting, of "XX-XX-XXXX." The second document was a photocopy of what was purported to be a course sign-in sheet with the typed date of "02/12/02," and the typed course number "XX-XX-XXXX."
On both of these sheets, petitioner's name was listed last. This placement caught Egnatovich's eye. As Egnatovich entered the computer database to check on petitioner's records, he discovered that course number "XX-XX-XXXX" did not exist. Egnatovich then looked more closely at the sign-in sheet for that course on the fax that Mrs. D'Ambrosio had sent him. He perceived that the course number on the fax had been altered, in that the number "1" had been written over the number "0" in both the course number and the course date. Egnatovich then checked the course database and discovered that there was a course numbered "XX-XX-XXXX" that had been offered on November 14, 2000, not November 14, 2001. Based on these discrepancies, Egnatovich concluded that the information submitted by Mrs. D'Ambrosio concerning the first sign-in sheet was not accurate.
Suspecting that the second sign-in sheet had also been altered, Egnatovich contacted Saint Barnabas Medical Center's EMS Training Academy and requested a copy of the sign-in sheet for course number XX-XX-XXXX. As the course provider, Saint Barnabas was responsible for maintaining the original sign-in sheets and for transmitting copies to OEMS so that attendees received appropriate course credit. As requested, *114 Saint Barnabas faxed to Egnatovich a photocopy of its original sign-in sheet for the course. Petitioner's name was not on that original. When comparing the original with the fax he had received from petitioner's wife, Egnatovich noticed that the signature of the course instructor, Joel Bunis, appeared "greatly different" on the two documents.
Egnatovich also asked Saint Barnabas to provide the original sign-in sheet for course number XX-XX-XXXX, to compare it with what he received from Mrs. D'Ambrosio. He was informed that the hospital had apparently destroyed that particular record. Egnatovich could not locate in OEMS's own files the original copy of the sign-in sheet from that course.
Egnatovich then contacted Bunis and showed him the sign-in sheet for course number XX-XX-XXXX that he had received from Mrs. D'Ambrosio. Bunis told him that it was "definitely not" his signature on that faxed sheet. Bunis stated to Egnatovich that he always checked the sign-in sheet at the end of each class he taught. Bunis said that he did so as a routine practice to verify that the number of attendees matched the number of signatures on the list, and thereby "make sure no one either didn't sign in or left before the completion of the course."[2]
At this point, Egnatovich strongly believed that petitioner and his wife had altered the two sign-in sheets and forged petitioner's name. Egnatovich perceived that they did so to make it appear that petitioner had taken classes that he did not take. Egnatovich requested that petitioner and Mrs. D'Ambrosio come to the OEMS office in Trenton to explain the discrepancies. They agreed to come, although they refused to be interviewed separately.
During the course of her interview with Egnatovich, Mrs. D'Ambrosio stated that she always made a copy of the sign-in sheet at the start of class. She claimed that the sign-in sheets she had faxed to Egnatovich were the genuine copies of the originals. Petitioner, meanwhile, asserted in his own interview, that he had come in late for the two courses in question and that he must have signed the copied sheet, but not the original. However, neither petitioner nor his wife could explain the differing signatures on the relevant documents, or the apparent alterations of the course numbers and dates.
While the Department's investigation was ongoing, petitioner received a notice from OEMS dated April 22, 2004, stating that he had not completed the required courses for recertification. Mrs. D'Ambrosio had already learned this from her conversation in February with Egnatovich. The April letter from OEMS included a computerized printout listing the classes petitioner had taken from 2001 through 2003. The letter stated, in pertinent part:
If you do not earn the required [continuing education] credits prior to your expiration date, you will not be re-certified as an EMT-B. If in the future you wish to renew your certification, you must successfully complete a CORE 12 program and then the EMT-B written examination.
Upon receiving this letter, petitioner completed the required courses in June 2004, outside of his three-year recertification cycle.[3]
*115 Nevertheless, the Department decided that it would not recertify petitioner. Instead, it determined that it would permanently ban him from recertification in the future, based on his apparent falsification of records. After petitioner received notification of the Department's adverse decision in October 2004, he requested a hearing in the Office of Administrative Law ("OAL").
At the OAL hearing, petitioner and his wife both testified in his defense. Mrs. D'Ambrosio[4] explained that, since she was the Fanwood Rescue Squad's training officer at the time, it was her responsibility to keep internal records of the EMTs who attended continuing education classes. To do this, she had a routine practice of photocopying the sign-in sheets at the beginning of each training class. She would then return the original and the copy to the sign-in table, so that latecomers could sign both sheets. She explained the instructor would not ordinarily sign the sheet until the end of class, after which he would take the original and later submit it to OEMS. The photocopies were kept in a file cabinet in the Rescue Squad's offices.
Mrs. D'Ambrosio testified that she did not make any changes to the course number or date on the sign-in sheets she had faxed to Egnatovich, and she had no reason to believe that it had been altered. With respect to course number XX-XX-XXXX, she specifically testified that she recalled her husband attending that class, stating, "[to the] [b]est of my recollection I remember him there. I don't remember him missing classes. I remember him coming in late often." She added that he was often late for class because of his employment.
Mrs. D'Ambrosio further testified that it was not unusual for other squad members to not receive credit by OEMS for courses they actually had taken. She often had to submit the squad's own verifying records to OEMS to correct the situation. She said she had never experienced any problem in the past with this procedure. Even so, she offered no explanation for why the sign-in sheets for course number XX-XX-XXXX from her records and from Saint Barnabas had obviously different instructor signatures.
Petitioner testified that he attended both courses for which he sought credit, and that he signed in on the sheet for each course when he arrived at the relevant class site. He likewise had no explanation for why there were divergent signatures on the two copies of the sign-in sheets for course number XX-XX-XXXX, except that perhaps "somebody put it there for reference purposes, but I don't have knowledge of that."
In his initial decision, the ALJ agreed with the Department that the proofs had established that petitioner had submitted fraudulent documents to support his recertification. However, the ALJ regarded the sanction proposed by the Department as too severe. In particular, the ALJ observed that:
The Department contends that [petitioner's] display of unreliability and dishonesty should preclude him from ever being recertified as an EMT-Basic. Although [petitioner's] rather questionable behavior in this case, undoubtedly warrants disciplinary action, refusal to forever recertify [petitioner] is quite severe. He and his wife have been [EMTs] for a period in excess of 30 years with no evidence of any prior complaints and *116 much evidence of beneficial service to the people of Fanwood. The Department's rather casual approach to its record keeping may have unwittingly given [petitioner] the idea that he could avoid requirements that the Department deemed crucial. I am concerned with [petitioner's] obstinacy and insistence in perpetuating what I believe the Department has proven by a preponderance of the evidence is a rather amateurish attempt to bypass certification requirements, but nonetheless, [I] conclude that permanent denial is too severe based on the absence of prior offenses.

[Emphasis added.]
The ALJ instead recommended that petitioner be denied recertification for five years, measured from the date that his last certification expired, i.e., from December 31, 2003.
On August 31, 2007, the Commissioner of the Department issued a final decision adopting the ALJ's findings and conclusions. The Commissioner specifically agreed with the ALJ that petitioner had "attempted to deceptively or fraudulently procure [EMT-B] recertification by making material misrepresentation concerning his attendance at required continuing education courses." Consequently, the Department's refusal to recertify petitioner's EMT-B certification was reaffirmed.
Consistent with the ALJ's recommended sanction, the Commissioner declared petitioner "ineligible for EMT-Basic certification until December 31, 2008, at which time certification shall not be issued until all requirements are met to the satisfaction of the Department."
Petitioner then filed the present appeal.[5] The central theme of his appeal is one that he did not raise in the administrative proceedings: namely, that the Department lacks the statutory authority to regulate the certification of EMT-Bs. Petitioner further argues that the evidence of wrongdoing was insufficient to strip him of his State certification, and that the Commissioner's final decision and sanction was arbitrary and capricious. At worst, he contends, he arrived less than fifteen minutes late for two continuing education courses, and that such tardiness does not justify the forfeiture of his certification. He also emphasizes that he has over three decades of experience as an EMT, and has passed the Department's recertification exam.

II.
We begin by outlining petitioner's statutory arguments, and deciding the threshold question of whether we should consider these arguments substantively at all, since they are being raised for the first time on appeal. We also must consider whether these issues are moot, if petitioner has indeed maintained a national certification while his State certification has been expired.
Petitioner maintains that the Commissioner had no authority to sanction him because, under the EMS Act,[6] the Department *117 allegedly is not vested with the power to regulate the certification of EMT-Bs. Rather, petitioner claims that local rescue squads are responsible for training their own members, under the authority of the Traffic Safety Act. The Department responds that the EMS Act authorizes the Commissioner to certify all levels of EMTs, including EMT-Bs, and that the Traffic Safety Act is inapplicable here.
Preliminarily, we are satisfied that these statutory issues before us are not moot. See Zirger v. General Acc. Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996). As we have already noted, petitioner indicated at the OAL hearing he has been inactivated by his local rescue squad during the pendency of the Department's administrative action. Although we do not know if petitioner has been serving as an EMT for some other organization or in an individual capacity in the interim, there remain significant consequences to the Department's action. The five-year sanction, if it is sustained, undoubtedly represents a permanent negative mark in petitioner's service record. Additionally, an EMT whose State certification has lapsed faces more stringent requirements for national recertification than one who continues to be State-certified.[7] We further note that petitioner's State disqualification remains in effect under the Commissioner's order through December 31, 2008. Accordingly, we conclude that the present appeal involves a real and ongoing controversy.
We are also persuaded that we should reach the statutory issues posed on this appeal by petitioner because they touch upon the public interest and could have widespread importance for other EMTs, rescue squads, health care providers, and other persons and organizations in the field. See Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973) (noting that although appellate courts ordinarily should not reach issues that were not presented below, an exception applies where the issues significantly affect the public interest); State v. Robinson, 399 N.J.Super. 400, 410, 944 A.2d 718 (App.Div.2008) (same). Moreover, petitioner's statutory claims raise pure issues of law, as to which the Department as an administrative agency has no greater expertise than this court. Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973). There is no need to develop the administrative record any further in order to analyze these legal issues. We therefore will resolve them.
At the outset, we restate the core principles of statutory construction that must guide our analysis. "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). A court should "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid.; see also Soto v. Scaringelli, 189 N.J. 558, 569, 917 A.2d 734 (2007). When reviewing two separate, but related, statutes, "the goal is to harmonize the statutes in light of their purposes." Am. Fire & Cas. Co. v. N.J. Div. of Taxation, 189 N.J. 65, 79-80, 912 A.2d *118 126 (2006). Ultimately, a court's role when analyzing a statute is to give effect to the Legislature's intent as evidenced by the "language of [the] statute, the policy behind it, concepts of reasonableness and legislative history." Johnson Mach. Co. v. Manville Sales Corp., 248 N.J.Super. 285, 303-04, 590 A.2d 1206 (App.Div.1991) (citing Monmouth County v. Wissell, 68 N.J. 35, 342 A.2d 199 (1975)).

The EMS Act
The EMS Act provides broad authorization for the Department to regulate and certify various levels of EMTs and paramedics, including mobile intensive care paramedics (N.J.S.A. 26:2K-8); EMT-intermediates (N.J.S.A. 26:2K-25); EMTs trained in cardiac defibrillation ("EMT-Ds") (N.J.S.A. 26:2K-40); and EMTs trained to administer an epinephrine auto-injector device (N.J.S.A. 26:2K-47.2). The Act also authorizes the Department to institute regulations to effectuate its provisions. N.J.S.A. 26:2K-17, -31.
A pivotal issue here is whether the EMS Act specifically authorizes the Department to regulate the training and certification of EMT-Bs. Unlike the various categories of EMTs described above, each having a particular statutory subsection that expresses the Commissioner's authority to regulate them and to "establish written standards" for their certification, see, e.g., N.J.S.A. 26:2K-25, the EMS Act does not contain any specific provision for the training and certification of EMT-Bs. There is no reference anywhere in the Act to what the Department refers to as an "EMT-Basic" category of certification.
Significantly, however, the EMS Act broadly defines an emergency medical technician as, "a person trained in basic life support services as defined in [N.J.S.A. 26:2K-21] and who is certified by the Department of Health [and Senior Services][8] to perform these services." N.J.S.A. 26:2K-39 (emphasis added). In turn, "basic life support" is defined by the statute as "a basic level of pre-hospital care which includes patient stabilization, airway clearance, cardiopulmonary resuscitation, hemorrhage control, initial wound care and fracture stabilization and other techniques and procedures authorized by the [C]ommissioner." N.J.S.A. 26:2K-21 (emphasis added). Thus, an EMT of any category, by definition, must be certified by the Commissioner.
The Department explains that the reason the EMS Act does not explicitly refer to EMT-Bs is because an EMT-B is simply a more recent title given to those who were formerly classified as EMT-Ds under the statute. There is nothing in the EMS Act specifically referring to this change in nomenclature. However, the regulations at issue in this case, promulgated under N.J.S.A. 26:2K-39 to -47, support the Department's contention.
The pertinent history of the regulations is as follows. In 1999, the Department proposed a change in its rules to require that all EMTs be trained to use a defibrillator. 31 N.J.R. 2864(a) (October 4, 1999). The summary for this proposed rule change stated:
The amendments now being proposed reflect significant changes in defibrillation equipment technology and use in the decade since the prehospital defibrillation program was initiated. The automated external defibrillators (AED) now in use have made defibrillation a standard procedure for all basic life *119 support personnel, such as EMTs, rather than an advanced life support procedure which requires extensive specialized training and monitoring....
... The proposed amendments will make defibrillation training a standard, required component of both basic and continuing education training for all EMTs. When this change is fully implemented, every certified EMT in the State will be trained to perform cardiac defibrillation, and the term EMT-D will no longer be used.

[Ibid. (Emphasis added).]
These amendments became effective in 2000. 32 N.J.R. 701(a) (February 22, 2000). However, the Department did not formally incorporate the term "EMT-Basic" into its rules until 2003. At that time, the Department sought to rename its chapter of regulations entitled "Emergency Medical Technician Training," to "Emergency Medical TechnicianBasics: Training and Certification." See 35 N.J.R. 2043(a) (May 19, 2003). The summary for that proposed rule change, as published in the New Jersey Register, stated:
The proposed new rules seek to expand upon the recently expired standards for the training, testing and certification of Emergency Medical Technician-Basics, and to incorporate the rules for Emergency Medical Technician-Defibrillations currently found at N.J.A.C. 8:41A. As the regulated community is aware, the Department no longer issues Emergency Medical Technician-Defibrillations certifications; rather, such training is now required as part of the certification process for Emergency Medical Technician-Basics [EMT-Bs].

[Ibid. (Emphasis added).]
These proposed rule changes became effective on June 21, 2004. See N.J.A.C. 8:40A-1.1 to -10.4. They will expire on June 21, 2009. 36 N.J.R. 3117(b) (June 21, 2004).[9]
We are cognizant that the statutory provisions regulating EMT-Ds have not been repealed. We are also mindful of the general principle against implied statutory repealers. See, e.g., Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 280, 486 A.2d 818 (disfavoring "repeal by implication" in the absence of "clear and compelling evidence of the legislative intent"), cert. denied sub. nom., Demarest v. Mahwah, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985). Nevertheless, the plain language of the EMS Act supports the conclusion that the Department has the authority to regulate EMT-Bs, and to administer standards for their recertification. This is because any person who is an EMT-B must first be, by necessity, an EMT. Therefore, under the EMS Act, that person must be certified by the Commissioner.
We also consider the legislative purpose behind the statute. The original legislation dealing with emergency medical services, N.J.S.A. 26:2K-1 to -6, was enacted into law in 1973. The Sponsor's Statement to that bill indicated that:
Training for these paramedics [as delineated in the act] will be complementary to, and independent of, the State's continuing training program for members of first aid, rescue and ambulance squads under the New Jersey Highway Safety Act of 1971.... Under that Act, the State provides training for squad members in more usual emergency treatment techniques.

*120 [Sponsor's Statement, S. 2135 (Oct. 16, 1973).]
N.J.S.A. 26:2K-1 to -6 was repealed by the current EMS Act, enacted in 1984. See Senate Institutions, Health and Welfare Committee Statement to A. 551 (June 18, 1984). Although the legislative history for the current EMS Act does not specify which State department oversees the training of rescue squad members, it does retain language indicating that the Act "does not apply to any emergency training service program operated pursuant to the `New Jersey Highway Safety Act of 1971.'" Assembly Corrections, Health and Human Services Committee Statement to A. 551 (March 15, 1984).
It is clear from this legislative history that the relevant statutes have all contemplated that the State, and not local municipalities, retain control over the training of first aid workers and EMTs. The next question is which State department was entrusted with this regulatory role. The answer is reflected in the legislative history to the subsequent 1987 Traffic Safety Act, which revised and superseded the 1971 Highway Safety Act.
As the legislative history from 1987 states, the Traffic Safety Act "removes from the responsibilities [of the Department of Transportation's Office of Highway Safety] the training and certifying of first aid, rescue and ambulance squads. These functions currently are performed by the Department of Health." Assembly Law, Public Safety, Defense and Corrections Committee Statement to A. 3843 (June 11, 1987). Read in conjunction, the legislative histories indicate that, at least since 1987, the Department of Health (now the Department of Health and Senior Services) has exercised responsibility for the training and certifying of EMTs and other first aid workers.
Moreover, the text of the related Emergency Medical Training Fund Act, adopted in 1992, N.J.S.A. 26:2K-54, sheds further light on the purpose of the statutes:
The [C]ommissioner [of the Department of Health] shall establish a State advisory council for basic and intermediate life support services training. The council shall be responsible for: (1) establishing guidelines and making recommendations regarding reimbursement from the fund to entities providing EMT-A or EMT-D testing and training activities, (2) making recommendations for changes in emergency medical services testing and training activities or the creation of new programs as necessary to conform with federal standards, or to improve the quality of emergency medical services delivery, (3) establishing guidelines for the purchase of emergency medical services training equipment, and (4) developing recommendations for the most effective means to recruit emergency medical services volunteers.
[N.J.S.A. 26:2K-59(a) (emphasis added).]
In addition to these expressions of legislative intent within the texts of the statutes and their legislative history, we are also guided by concepts of "reasonableness." Johnson Mach. Co., supra, 248 N.J.Super. at 303-04, 590 A.2d 1206. It is entirely reasonable that the same Department that certifies all other types of EMTs and paramedics would also be responsible for certifying EMT-Bs. It is also reasonable to presume that the Legislature is familiar with its own provisions and with how the Department entrusted with enforcing those enactments has interpreted them. See, e.g., Salvador v. Dep't of Corr., 378 N.J.Super. 467, 470, 876 A.2d 309 (App.Div.) (stating that courts may presume Legislature "is familiar with its own enactments and [their] consequences"), *121 certif. denied, 185 N.J. 295, 884 A.2d 1265 (2005). Consequently, we are satisfied that the Department of Health and Senior Services has the statutory authority to regulate those who provide basic life support services, or EMT-Bs.

The Traffic Safety Act
Petitioner further asserts that the Department has no authority to regulate EMT-Bs because of language found in the Traffic Safety Act, which he reads as vesting sole authority in local municipalities to regulate and certify members of rescue squads. He points specifically to Section 27 of the Traffic Safety Act, which includes an annual certification requirement administered by each municipality with a rescue squad:

The officers of each volunteer and nonvolunteer first aid, rescue and ambulance squad providing emergency medical service programs shall be responsible for the training of its members and shall notify the governing body of the political subdivision in which the squad is located, or the person designated for this purpose by the governing body, that particular applicants for membership ... ambulances, and ambulance equipment meet the standards required by this act. Upon receipt of such notification the governing body or person designated shall certify the applicant, ambulances, and ambulance equipment as being qualified for emergency medical service programs, and shall issue a certificate to that effect at no charge. Each member and piece of equipment of a volunteer and nonvolunteer first aid, rescue and ambulance squad shall comply with the requirements for certification annually. Any person who is a member of a volunteer and nonvolunteer first aid, rescue and ambulance squad providing emergency medical service programs on the effective date of this act shall, if application is made to the appropriate municipality within 90 days of the effective date, be certified by the governing body or designated person as being qualified for emergency medical service programs for a period of two years. At the end of that period, the person shall comply with the requirements for certification annually.

[N.J.S.A. 27:5F-27 (emphasis added).]
In addition, Section 22 of the Traffic Safety Act provides for the creation of a New Jersey Highway Traffic Safety Program, and mandates that this program:
shall include the training program for members of volunteer first aid, rescue and ambulance squads, adopted by the New Jersey State First Aid Council, which shall comply with the uniform standards promulgated by the United States Secretary of Transportation in accordance with the "U.S. Highway Safety Act of 1966" ... and any amendments or supplements to it.
[N.J.S.A. 27:5F-22.]
Petitioner contends that these provisions within the Traffic Safety Act exclusively govern his training and State recertification process, and that, based on these provisions, the Commissioner has no authority to deny him recertification. As further support, petitioner points to cross-referencing language in the EMS Act, acknowledging that "[n]othing in this act shall be construed as interfering with an emergency service training program authorized and operated under the provisions of the `New Jersey Highway Traffic Safety Act of 1987.'" N.J.S.A. 26:2K-33, -46. This cross-reference, petitioner argues, demonstrates that the Traffic Safety Act has primacy over the EMS Act in the area of training emergency service workers. We disagree.
*122 The Legislature's purpose in passing the Traffic Safety Act was explicitly incorporated into its findings when it adopted that legislation:
The Legislature hereby finds and determines that the toll of deaths and injuries resulting from highway accidents is a matter of State concern. Although the State and local governments presently are active in virtually all areas of highway safety, a formal mechanism should exist for the integration and coordination of existing safety efforts. The establishment of a Statewide highway traffic safety program under the guidance and direction of the Governor will provide this needed mechanism to coordinate State and local efforts in the struggle to reduce highway deaths and injuries.

[N.J.S.A. 27:5F-19 (emphasis added).]
In addition, a statement from the Assembly Law, Public Safety, Defense and Corrections Committee, reporting favorably on the proposed Traffic Safety Act, provided:
[U]nless an overriding public safety concern exists, a law enforcement officer shall permit a first aid, rescue, or ambulance squad member or a physician to provide medical aid to an injured person. The purpose of the bill is to ensure that appropriate medical aid is provided promptly to an injured person by trained medical personnel while, at the same time, a law enforcement officer maintains his authority over all persons and events at the scene of an injury. [Assembly Law, Public Safety, Defense and Corrections Committee Statement to A. No. 1301 (enacted as L. 1987, c. 122).]
These provisions, logically construed, indicate that the purpose of the Traffic Safety Act is not to train and certify EMTs in basic life support services, as those skills are applied in a variety of places and circumstances. Rather the Traffic Safety Act mandates supplemental training for rescue workers in the discrete area of roadway safety.
Viewed in this light, the EMS Act and the Traffic Safety Act can be construed in a way that harmonizes both statutes and affords them a rational and coordinated meaning intended by the Legislature. See State v. Malik, 365 N.J.Super. 267, 275, 839 A.2d 67 (App.Div.2003) ("[I]t is not proper statutory construction to reach a result which would render a provision completely meaningless."), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004). Although they contain similar language, the two Acts address very different issues in the area of emergency medical services.
The Traffic Safety Act is broader in its application, yet narrower in its scope, than the EMS Act. It is broader in application in that it mandates that each rescue squad be "responsible for the training of its members." N.J.S.A. 27:5F-27 (emphasis added). The term "member" in that provision cannot be synonymous with an "EMT," because not all members of a rescue squad are EMTs. Some may be ambulance drivers; others may staff the emergency hotline. Others may be responsible for maintaining the equipment, or in charge of fundraising.
Just as all rescue squad members are not EMTs, it is also true that not all EMTs are members of rescue squads. For instance, a person certified as an EMT may also be a paid staff member of a hospital, a fire department, or a private ambulance service. Thus, the Traffic Safety Act's requirement that local rescue squad train their own members has a much broader application than the EMS Act, which applies solely to EMTs and paramedics.
*123 On the other hand, the Traffic Safety Act, though broader in application, is narrower in scope than the EMS Act. The Traffic Safety Act mandates that members of rescue squads receive training, but the specifics of that training are simply described in the Act as: "the uniform standards promulgated by the United States Secretary of Transportation in accordance with the `U.S. Highway Safety Act of 1966.'" N.J.S.A. 27:5F-22. In addition, "members of volunteer first aid, rescue and ambulance squads" must receive training "adopted by the New Jersey State First Aid Council," which is likewise based upon the federal Highway Safety Act. Ibid.
In turn, the focus of the federal Highway Safety Act is explicitly aimed at reducing the number of highway fatalities in our nation. See 23 U.S.C.A. § 402(a) ("Each State shall have a highway safety program approved by the Secretary, designed to reduce traffic accidents and deaths, injuries, and property damage resulting therefrom."). The state programs must be "in accordance with uniform guidelines promulgated by the Secretary [of the federal Department of Transportation]." Ibid. These federal guidelines mandate each state to administer programs designed to, among other things, "reduce injuries and deaths resulting from motor vehicles being driven in excess of posted speed limits." Ibid. The federal guidelines promulgated under the Highway Safety Act designate "emergency medical services" as one of six program areas "encompassing a major highway safety problem which is of national concern." 23 C.F.R. § 1205.3. States may receive federal grant money to implement such programs. Ibid.
As parallel state legislation, our Traffic Safety Act was based on and developed in accordance with the federal program for improving highway safety. See N.J.S.A. 27:5F-22. For this reason, the training mandated by the Traffic Safety Act is specifically geared towards responding to highway accidents and emergencies. In contrast, EMTs are trained to respond to all types of medical emergencies, regardless of where they occur. For example, an EMT responding to a call from a person injured inside his or her own home would not come under the purview of the Traffic Safety Act. See, e.g., Shehaiber v. Univ. of Med. & Dentistry of N.J., 360 N.J.Super. 330, 336-37, 823 A.2d 61 (App.Div.2003) (holding that the Traffic Safety Act did not impose a duty on EMTs to attempt a water rescue of a child who fell into a contaminated backyard pool, because this type of rescue was not contemplated by the Traffic Safety Act, nor by the federal Highway Safety Act).
In sum, the training of rescue squad workers referred to in the Traffic Safety Act is meant to supplement, and not supplant, the training and certification of EMTs under the EMS Act. EMT-Bs that are members of rescue squads must receive, along with all other rescue squad members, the training authorized under the Traffic Safety Act. That training, limited in scope and focused upon highway safety, is not a substitute for the certification procedures required by the Department under the authority of the EMS Act. Simply stated, the Traffic Safety Act involves the regulation of activities on roadways, while the EMS Act involves life-saving care in an innumerable range of contexts, both on and off the roads.
We conclude that the EMS Act authorizes the Commissioner of the Department of Health and Senior Services to certify and recertify EMT-Bs throughout the State. This conclusion is supported by the text of the EMS Act, the policies behind that statute, and common sense. *124 Nothing in the Traffic Safety Act emasculates that regulatory authority. Consequently, the Department's regulations under which petitioner has been sanctioned, N.J.A.C. 8:40A-1.1 to -10.4, are valid and were lawfully applied here.

III.
[At the direction of the court, the published version of this opinion omits Part III, which addresses the sufficiency of the evidence of petitioner's wrongdoing and the propriety of the sanction the Department imposed. See R. 1:36-3.]

IV.
For these various reasons, the Department's final agency decision of August 31, 2007 is affirmed.
NOTES
[1] Courses seven and twelve are specifically at issue in this appeal. It is unclear from the record whether petitioner ever furnished proof that he took courses eight and nine during the recertification cycle.
[2] Bunis did not testify at the administrative hearing, as he apparently had moved out of state by that time.
[3] Petitioner also claimed in the OAL hearing that he passed the written EMT-B exam, but nothing in the record demonstrates that assertion.
[4] At the time of the OAL hearing, Mrs. D'Ambrosio held a State EMT certification. She was also charged with improprieties in connection with this case, but she apparently reached a settlement with the Department, a copy of which is not contained in our record.
[5] It is unclear from the record if petitioner is currently serving as an EMT. Petitioner contends in his legal argument that State certification is not required for him to serve in New Jersey as a volunteer EMT, because he still has a national certification. However, he testified at the OAL hearing in December 2006 that he was "suspended," presumably by the Fanwood Rescue Squad, "until this thing gets straightened out." We also note that petitioner did not seek a stay of the Department's final agency decision pending this appeal.
[6] The official title of the legislation was "An Act concerning emergency medical services, supplementing Title 26 of the Revised Statutes, and repealing P.L. 1973, c. 229." See N.J.S.A. 26:2K-7, historical and statutory notes.
[7] This additional hurdle to national recertification is reflected in requirements specified on the NREMT's website. See www.nremt. org/EMTServices/reg_basic_history.asp (last visited Oct. 21, 2008) ("If the candidate's initial training is beyond two (2) years and state certification has not been maintained, the candidate must complete the entire [national] EMT-Basic education program.").
[8] As the result of a governmental reorganization, the Department of Health changed its name to the Department of Health and Senior Services in 1996. See 28 N.J.R. 2655(a) (June 17, 1996).
[9] The enabling section of the EMS Act, meanwhile, has not been amended since 1997. N.J.S.A. 26:2K-39, chapter notes.